FIRST NATIONAL BANK OF SIKE-STON, Appellee-Cross Appellant,

v.

TRANSAMERICA INSURANCE COMPANY, Appellant-Cross Appellee.

Nos. 74–1487 and 74–1541.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 7, 1975.

Decided April 17, 1975.

Rehearings and Rehearings En Banc Denied May 12, 1975.

982

Thomas C. Walsh, St. Louis, Mo., for appellant-cross appellee.

James E. Reeves, Ward & Reeves, Caruthersville, Mo., for appellee-cross appellant.

Before GIBSON, Chief Judge, and HEANEY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

Transamerica Insurance Company appeals a judgment of the District Court for the Eastern District of Missouri holding it liable to its insured, First National Bank of Sikeston, Missouri (First National), on a banker's blanket bond. The claim originated from a previous lawsuit which was unsuccessfully defended by First National.[1] First National has filed a cross-appeal seeking punitive damages and attorney's fees expended in this suit.

The earlier lawsuit held First National liable to Providence State Bank of Providence, Kentucky, for checks drawn on First National which it refused to pay. In First National's view, liability in the first lawsuit arose from the wrongful or fraudulent acts of Donald R. Bohannon, who they contend was covered by fidelity provisions of the bond issued by Transamerica. Bohannon was employed by First National from 1958 until June 1971 and served as President from 1966 until January 1971. He was also a member of the Board of Directors from 1966 until June 1971.

Bohannon acquired part-ownership of Gibson Livestock Company, Marion, Kentucky, in February 1969. Gibson Livestock was primarily engaged in buying and selling cattle; these operations were conducted by its president, Tommy Gibson. The company required large amounts of operating capital which it had difficulty obtaining. For awhile First National helped supply this capital by giving immediate credit on uncollected drafts deposited by Gibson Livestock, but this was discontinued due to objections by the Comptroller of the Currency, who considered the immediate credits to be in excess of the bank's loan limit. Bohannon's ownership of Gibson Livestock shares was also criticized as a conflict of interest by the Regional Comptroller, who recommended in May, 1970 that Bohannon resign. The criticisms of the Comptroller led Gibson and Bohannon to seek other sources of Gibson Livestock operating capital in late 1970. His business interests caused Bohannon to resign as President of First National in January, 1971, and eventually to resign from the bank altogether.

To obtain financing for the cattle operation Bohannon went to Joel Montgomery, a director and shareholder of First National. Montgomery was also a co-trustee of the Montgomery trust. Bohannan and the trust had controlling interest in the single bank holding company which owned 80–90% of First National. In December and January Bohannon and Montgomery arranged for a line of credit for Gibson Livestock with Union Planters Bank in Memphis. This provided that Union Planters would give immediate credit on uncollected drafts which the livestock company placed in its checking account. The Montgomery Trust guaranteed Union Planters against any loss it might incur in operating the account and Gibson and Bohannon agreed to guarantee Montgomery Trust against loss. Gibson and Bohannon also agreed to pay Montgomery Trust $52,000 for Joel Montgomery's assistance in obtaining the line of credit. Bohannon was the only Gibson Livestock officer authorized to draw on the Union Planters account.

About the same time that these negotiations were proceeding with Union Planters Bank, the First National Bank

---

1. Providence State Bank v. First National Bank, No. S–71–C–60 (E.D.Mo., June 27, 1972).

of Sikeston's Board of Directors authorized Gibson Livestock to reopen their checking account, with the understanding that no immediate credit would be given on uncollected checks or drafts deposited. Also in December 1970 or January 1971, Bohannon and Gibson met with the president of Providence State Bank in Providence, Kentucky. Bohannon explained that Gibson Livestock was arranging for a line of credit with Union Planters Bank and therefore the cattle company would always have funds immediately available to pay for cattle purchases. He stated that funds would be transferred from Union Planters to the checking account at First National where Bohannon could easily monitor Gibson Livestock's finances. Bohannon assured the Providence bank's president that because of the credit arrangement with Union Planters, any checks which Gibson Livestock drew on its First National account would be paid; therefore, according to Bohannon, Providence State Bank could allow immediate credit on any such checks deposited at Providence with no consequent risk. Although Bohannon and Gibson gave the impression that Bohannon was speaking as the president of the bank, First National had never authorized such a guarantee.

This banking triangle began operation in early February 1971, Gibson, in Kentucky, would sell cattle and relay the sale data to Bohannon in Sikeston, Missouri. Bohannon would write sight drafts on the buyers payable to Gibson Livestock, which were sent to Union Planters. Union Planters, in Memphis, gave Gibson Livestock's account immediate credit on these uncollected drafts and sent them through Federal Reserve channels for collection.[2] When funds were needed for cattle purchases, Gibson Livestock would write checks to itself on its First National account and deposit them in its Providence State Bank account. The Providence bank, relying on Bohannon's guarantee, gave immediate credit for the checks deposited, and Gibson Livestock paid for the cattle with checks drawn on Providence State Bank. Providence State Bank sent the checks, which were already credited to Gibson Livestock's account, to First National via the Federal Reserve System. It took from four to six days for the checks to arrive at First National in Sikeston. Each day Bohannon would determine the amount required to cover these checks presented at First National for payment and would call Union Planters in Memphis. Upon receiving authorization from Bohannon, Union Planters would accomplish a wire transfer of funds to the Gibson Livestock account at First National. The funds transferred would be applied to payment of the Gibson Livestock checks that had been presented to First National for collection on that particular day.

The three bank arrangement effected a float: a system whereby Gibson Livestock had the use of hundreds of thousands of dollars for short periods without having to pay interest. The cattle company was thus able to buy cattle, resell them quickly, and pay for them with the money realized from their sale.

The dollar volume handled by Gibson Livestock's banking triangle steadily increased.[3] The volume in April 1971 was so great that Bohannon began to be suspicious; he was alarmed further because several drafts for cattle payment which

---

2. These drafts were encoded on First National's magnetic encoding machine. Encoding drafts and sending them through the Federal Reserve System meant they were treated as checks, or cash items, rather than drafts, which are noncash items. Federal Reserve Regulation "J", 12 C.F.R. § 210.2 (1967); Federal Reserve Bank of St. Louis Operating Letter No. 9 (September 1, 1967). This had the effect of requiring cattle buyers' banks to dishonor the drafts by the midnight deadline or they would be debited to the bank's reserve at the Federal Reserve Bank and credited to the sending bank. Ordinarily, credit is not given for noncash items until payment therefor has actually been made to the Federal Reserve Bank. Regulation "J", 12 C.F.R. § 210.11(a) (1967).

3. About a million dollars went through the accounts in February, two million in March, and about three and one-half million in April 1971.

he had deposited in Union Planters had been returned unpaid in April.[4] Bohannon decided that the balance in the Union Planters account might not represent collectible funds. On Thursday, April 29, 1971, he decided not to transfer any more funds from Union Planters to First National, since this might result in a loss to Montgomery Trust under their guarantee to Union Planters, and *ipso facto*, liability of Gibson and Bohannon for Montgomery's loss. On the afternoon of the 29th, Bohannon told First National's cashier that Gibson Livestock did not have sufficient funds to cover the checks which Providence State Bank had sent to First National for collection. On the 29th and 30th of April, and on Monday, May 3, he instructed First National to return checks to Providence State Bank. Twenty-three checks amounting to $827,374.36 were sent back. Gibson Livestock's account in Union Planters had a balance on May 3, 1971, of $497,939.70, but as Bohannon had suspected, only $179,391.27 was collectible. This money was paid to various Gibson Livestock creditors, including Montgomery Trust, which received $40,000.00.

The Providence bank, acting on Bohannon's assurance that all checks which Gibson Livestock drew on First National would be paid, gave immediate credit on those checks which the livestock company had deposited. As the unpaid checks were returned, available funds of Gibson Livestock in the bank were applied toward payment. However, Providence State Bank lost $340,138.14 because it had honored Gibson checks drawn on the uncollected funds represented by the final checks which First National eventually returned unpaid. Providence State Bank sued First National for this amount in the Eastern District of Missouri. The court found that First National had failed to give timely notice of dishonor of all the checks and failed to

make timely return of some of the checks under the UCC and Federal Reserve requirements.[5] Therefore, First National was held liable to Providence State Bank for amounts paid out before they received notice of dishonor on May 3, 1971. After credit was given for certain security which Providence State Bank took from Gibson Livestock, a judgment was entered for the Providence State Bank in the amount of $100,174.22.

Transamerica repeatedly refused to defend First National in the Providence State Bank suit and refused to pay the judgment, whereupon First National brought this suit against Transamerica on the blanket bond. Transamerica made Bohannon a third party defendant requesting judgment for any amount for which it might be found liable. After trial in the district court, judgment was entered against Transamerica for the amount of the judgment, costs and attorney's fees in the Providence State Bank case: $120,359.04, plus interest from the date of judgment. Punitive damages and attorney's fees in the instant case were denied. Judgment was also issued for Transamerica against Bohannon for the amount that Transamerica was liable to pay First National.

On appeal, Transamerica contends that the loss did not result from any dishonest act of Bohannon but rather from failure of First National to promptly return the checks on April 29; that Bohannon was not covered by the bond; that the bond was cancelled by the bank's prior knowledge of dishonest and fraudulent acts of Bohannon; and the record of the first case was erroneously admitted into evidence in this case. First National appeals that portion of the judgment denying punitive damages and attorney's fees on the theory that Transamerica is guilty of a vexatious refusal to pay according to Missouri statutes.[6]

---

4. Bohannon, at the instance of someone from Gibson Livestock, was probably (knowingly or unwittingly) issuing drafts on nonexistent buyers or buyers who had not bought cattle.

5. Mo.Ann.Stat. § 400.4–302, V.A.M.S. (1965); Federal Reserve Regulation "J", 12 C.F.R. §§ 210.3, 210.12. Federal Reserve Bank of St.

Louis Operating Letter No. 9 (September 1, 1967); Federal Reserve Bank of St. Louis Operating Letter No. 9(a) (September 1, 1967).

6. Mo.Ann.Stat. §§ 375.296 and 375.420 (Supp. 1968).

Bohannon did not appeal. We reverse and order that a judgment of dismissal be entered because in our opinion First National had adequate knowledge of fraudulent and dishonest acts of Bohannon many weeks prior to the loss occasioned by the return of the Gibson Livestock checks to Providence State Bank. The bond was therefore not effective as to this transaction under the termination clause of the bond which reads as follows:

## TERMINATION OR CANCELATION

This bond shall be deemed terminated or canceled as to any Employee— (a) as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such Employee. . . .

First National was aware that its president, Bohannon, was also a part owner of Gibson Livestock in early 1969. Shortly thereafter First National gave immediate credit on drafts and checks deposited to Gibson's First National account without waiting to be sure these checks would be collected. At times this amounted to half a million dollars. The Comptroller of the Currency criticized this practice because it was considered to violate the bank's $150,000.00 loan limit. It also exposed First National to a potential loss if drafts or checks in sizeable sums were uncollectible. Bohannon's ownership of Gibson's stock was also criticized as a conflict of interest by the Regional Comptroller who suggested that Bohannon resign from the bank presidency in 1970. He did not do so at that time. In short, Bohannon was using his influence at First National to assist Gibson Livestock, of which he was part owner, to the possible detriment of First National, and the bank officials were aware of it. In May of 1970, however, the Gibson Livestock account at First National was closed.

Late in 1970 and early in 1971 Bohannon, assisted by another stockholder of First National, set up his complicated three bank float arrangement hereinbefore described. The primary purpose of this arrangement was to be able to use, on a continuing basis, several hundred thousand dollars of uncollected funds by getting immediate credit for checks drawn on First National by Gibson Livestock, payable to Gibson Livestock and deposited in Providence State Bank. As to most of these checks Gibson and Bohannon knew at the time the checks were written and deposited that there were then insufficient funds in First National to cover the checks. When these checks arrived at First National Bohannon would transfer funds from Union Planters National Bank in an amount sufficient to cover these checks which had been written four to six days earlier. In the meantime, Providence State Bank permitted Gibson Livestock the use of the money.

During a part of this period, early in 1971, Bohannon was an employee, officer and director of the bank. He would check each day and see what was needed to cover Gibson's checks and then transfer funds by wire from Union Planters National Bank to First National to equal the amount needed. After Bohannon resigned as an employee in January, 1971, he found out how much was needed each day from the Bank's cashier and then transferred the funds by wire.

The significance of these facts is obvious: in a situation where insufficient fund checks on a company account are presented to a bank almost every day, drawn four to six days earlier, and then made good upon presentation to the drawee bank on a daily basis by an officer of the company, the bank and its employees would *have* to be aware that the company was using that bank in a float scheme involving another bank. *See* Citizens State Bank v. Western Union Telegraph Co., 172 F.2d 950, 952 (5th Cir. 1949).

First National Bank of Sikeston, through its officers other than Bohan-

non, was aware of the following prior to April 29, 1971:

1. Bohannon was an officer of First National and part owner of Gibson Livestock.

2. Bohannon had used his position as an officer of the bank in 1969 to give Gibson Livestock immediate credit on checks deposited but not yet collected. The practice had been criticized by the Comptroller of the Currency and was discontinued. The practice also subjected First National to a possible loss if a significant number of drafts could not be collected.

3. The Regional Comptroller had advised First National and Bohannon that there was a conflict of interest and that Bohannon should resign. Bohannon refused. The bank at that time did not attempt to force him to do so.

4. In late 1970 and early 1971 Bohannon made his arrangements with Union Planters National Bank for immediate credit on sight drafts and started making transfers to First National to cover checks drawn on the Gibson Livestock account on the day they arrived at First National.

5. Each day, after Bohannon was no longer a full-time employee, a key employee of First National would advise Bohannon of the amount necessary to cover Gibson Livestock checks received that day. By looking at the dates the checks were drawn and checking Gibson Livestock's closing balance on that date, it was obvious to key employees of First National that Gibson was issuing checks which, when issued, exceeded by a substantial amount Gibson Livestock's closing balance on the date of issue. Responsible employees of First National therefore *had* to have knowledge that Gibson Livestock was engaged in an extensive "float" and that Bohannon was a

major participant in it. "Knowledge is what a reasonable person should have concluded from known facts." Alfalfa Electric Cooperative v. Travelers Indemnity Co., 376 F.Supp. 901, 906 (W.D.Okl. 1973).

The question then becomes whether this knowledge by the bank is sufficient to trigger the termination clause because of "any dishonest or fraudulent act" of an employee.

 The knowledge of key employees and officers obtained in the course of their employment is often imputed to the corporation, Acme Precision Products, Inc. v. American Alloys Corp., 422 F.2d 1395, 1398 (8th Cir. 1970), as is knowledge imparted to the Board of Directors. Beetschen v. Shell Pipeline Corp., 248 S.W.2d 66, 73–74 (Mo.Ct.App.), aff'd on other grounds, 363 Mo. 751, 253 S.W.2d 785 (1952). An exception is that when the employer, officer or director's interest is adverse to the corporation, his knowledge is not imputed to it. In re Estate of Torreyson, 442 S.W.2d 110, 117 (Mo.Ct.App.1969). Therefore, the knowledge of Bohannon is not ascribed to First National.

In its brief on this appeal, First National asserts:

Bohannon's conduct in becoming financially interested in Gibson Livestock Company and using his position as President of [First National] to arrange an elaborate banking arrangement to secure immediate credit for his company's checks with a total volume of more than $30,000,000.00 per year and making false representations that the checks would be paid by his employer were all in conflict with his position as president of [First National] and clearly were not in the best interest of his employer. In fact, Bohannon ignored the request of the regional controller [sic] of the currency that he resign because of his conflict of interest. Brief for Appellee at 32–33.

■ The evidence clearly establishes that First National knew all these facts, with the exception of the assurance to the Providence State Bank that checks would be paid, well before the loss occurred in this case. The evidence is equally clear that if First National had not continued to participate in the Providence State Bank float, no loss would have occurred.[7]

Appellee also states:

[T]he words, "dishonest" and "fraudulent" used in fidelity bonds are to be given a broad meaning and . . . a person can be dishonest and still not be guilty of criminal conduct, and . . . a conflict of interest on the part of an employee resulting in loss to the employer is dishonesty within the meaning of a fidelity bond. Brief for Appellee at 34.

■ We have long and consistently held that conduct may be fraudulent and dishonest within the meaning of a fidelity bond even though it falls short of a criminal offense. Boston Securities, Inc. v. United Bonding Insurance Co., 441 F.2d 1302, 1304 (8th Cir. 1971); General Finance Corp. v. Fidelity & Casualty Co., 439 F.2d 981, 986 (8th Cir. 1971); Fidelity & Deposit Co. v. Bates, 76 F.2d 160, 166–167 (8th Cir. 1935); United States Fidelity & Guaranty Co. v. Egg Shippers' Strawboard & Filler Co., 148 F. 353, 355 (8th Cir. 1906).

We have held that where an employee creates a conflict of interest and acts in his own interest, or acts in disregard of his employer's interest, subjecting it to a likelihood of loss, that is fraudulent and dishonest conduct within the meaning of a fidelity bond. Boston Securities, Inc. v. United Bonding Insurance Co., *supra*; General Finance Corp. v. Fidelity & Casualty Co., *supra*. And we have held that the practice of kiting checks constituted obtaining money under "false pretenses" as that term was used in a bond. Hartford Accident & Indemnity Co. v. FDIC, 204 F.2d 933, 937 (8th Cir. 1953). *See also* Fidelity & Casualty Co. v. Bank of Altenburg, 216 F.2d 294, 301–303 (8th Cir. 1954).

■ In this case the Comptroller of the Currency made it clear that giving immediate credit to Gibson Livestock's uncollected drafts and Bohannon's conflict of interest were unsafe and unsound banking practice. Yet the bank acquiesced in the conflict of interest and even assisted in circumventing the Comptroller's recommendations by knowingly participating in the check float. The wisdom of the Comptroller's criticisms became evident when the objectionable practices resulted in First National's loss. Under equitable principles "the insured may be barred or estopped from claiming recovery on the bond where it has knowledge of the course of conduct of the bonded employee which occasioned the loss." 13 Couch on Insurance 269 (2d ed. 1965). Surely the result should not be different where the insured has expressly agreed that the bond would be cancelled upon discovery of such a course of conduct. We hold that the conflict of interest and check float constituted fraudulent and dishonest conduct within the meaning of the bond. Since the bank had knowledge of these acts well before April 29, 1971, the bond was cancelled as to Bohannon before the loss occurred.

---

7. As stated in Citizens State Bank v. Western Union Telegraph Co., 172 F.2d 950 (5th Cir. 1949):

But for the inexcusable conduct of the bank in permitting, if not encouraging and in part inducing, the system of continuous kiting of checks which went on for so long, no substantial loss could have occurred. Had the bank acted in good faith, had it exercised the slightest diligence, it would have put a stop at once to the remarkable goings on between [the participants in the check kiting scheme], and at once notified plaintiff of them. Had it done so, the wrong doing would have been stopped in its beginnings, and no loss would have occurred. *Id.* at 952.

Accordingly, we reverse[8] the order of the district court and remand for dismissal of the complaint.

8. Transamerica also claims that the loss in this case occurred not because of any fraud of Bohannon but because First National employees failed to give prompt notice of dishonor as required by the Uniform Commercial Code. Even assuming that Providence State Bank was entitled to recover its loss occasioned solely by the false promise of Bohannon to pay the checks sent to First National by Providence State Bank, there is nothing in the record to show what *that* loss amounted to. If prompt notice of dishonor had been given on April 29, 1971, as suggested by Bohannon to the First National cashier, Providence State Bank may or may not have suffered a loss depending upon several factors including:

 (1) The promptness of Providence State Bank in then refusing to give immediate credit on any further Gibson checks.

 (2) The source and amount of deposits made in Gibson's Providence State Bank account subsequent to April 29, 1971.

 (3) The amount of security then held by Providence State Bank.

These factors were determined in the first case but only on the basis that prompt notice of dishonor was not given on *all* the checks received by First National from April 29, 1971, to May 3, 1971. The supplemental briefs of the parties on this question only demonstrate that any determination of the proper amount of damages would be speculative based on the present record even if the bond had not been held to be cancelled.