**FIRST AMERICAN STATE BANK, Appellee,**

v.

**The CONTINENTAL INSURANCE COMPANY, Appellant.**

**' FIRST AMERICAN STATE BANK, Appellee,**

v.

**Robert S. MILNIKEL, Appellant,**

**The Continental Insurance Company.**

**FIRST AMERICAN STATE BANK, Appellant,**

v.

**The CONTINENTAL INSURANCE COMPANY, Appellee.**

**Nos. 89–1154, 89–1155 and 89–1230.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 12, 1989.

Decided Feb. 22, 1990.

Richard P. Moore, Cedar Rapids, Iowa, Robert S. Milnikel, Chicago, Ill., for appellant.

Edward J. Gallagher, Jr., Waterloo, Iowa, for appellee.

Before ARNOLD and MAGILL, Circuit Judges, and LARSON,[*] Senior District Judge.

MAGILL, Circuit Judge.

The Continental Insurance Company (Continental)[1] appeals from a final judgment in favor of appellee, First American State Bank (First Bank),[2] in a breach of contract diversity action involving a bankers fidelity bond (the Bond).[3] Robert S. Milnikel, Continental's trial counsel, appeals the district court's[4] imposition of Fed.R.Civ.P. 37(b)(2) personal monetary sanctions. First Bank cross-appeals the district court's application of the Bond's potential income exclusion to deny coverage for future interest forfeited as a result of the restructuring of third party debt. We affirm.

## I. BACKGROUND

### A. Facts

From April 2, 1976 through July 2, 1982, Robert Clawson, First Bank's chief agricultural loan officer,[5] operated fraudulent loan and commodity/cattle schemes[6] involving two First Bank clients, Gilbert Hood and William Secor. False financial statements, falsified loan documents and elaborate withdrawal methods were used to conceal the nature of the transactions. First Bank lost $826,794.38[7] as a direct

---

[*] THE HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. Continental is a foreign insurance carrier with its principal place of business outside Iowa.

2. First Bank is an Iowa corporation, with its principal place of business in Iowa, engaged in the banking business.

3. Continental issued a standard bankers blanket bond, form 24, to First Bank on November 1, 1977.

4. The Honorable Edward J. McManus, United States District Judge for the Northern District of Iowa.

5. Robert Clawson was employed in First Bank's agricultural loan department since the fall of 1961. On January 8, 1969, Clawson became a vice president and an executive vice president on December 16, 1976. On December 10, 1981, Clawson became president of First Bank and was elected to its Board of Directors. Finally, Clawson became First Bank's chief executive officer on October 8, 1982.

6. Clawson was the subject of a Federal Bureau of Investigation (FBI) investigation. On March 1, 1985, Clawson was charged, under a two-count information, with theft, embezzlement and misapplication of funds in violation of 18 U.S.C. § 656 (1948). Clawson pled guilty on May 28, 1985. At the Guilty Plea and Sentencing, Clawson was apprised of the elements of the crime charged. The elements were that (1) defendant must be an employee of a Federal Deposit Insurance Corporation insured bank; (2) defendant knowingly and willfully either embezzled or misapplied money and funds belonging to a bank; and (3) defendant had the intent to injure or defraud a bank. Clawson indicated that he committed each of these elements with the requisite intent. Clawson admitted that he personally devised the schemes with the "ultimate purpose" to "get the money" because he could not do so directly as a bank officer. Clawson also indicated that he personally approved the loans without the knowledge of First Bank or its directors and assured Hood and Secor of the legality of the transactions. Clawson was sentenced to three years in prison.

7. The outflow of funds attributed by First Bank to the funding of the fraudulent First Bank–Hood–Clawson and First Bank–Secor–Clawson loans was $945,686.73, but the potential damages were mitigated by Clawson's contributions of assets totalling $118,892.35. The Hood/Clawson notes representing the transfer of loan proceeds to Clawson totalled only $373,-308.17. In addition, the Secor/Clawson notes totalled only $572,378.56, but only $270,000.00

result of the dishonest and fraudulent acts of Clawson in processing fraudulent loans.

In 1976, Clawson informed Hood that Hood had unused credit at First Bank which Clawson wanted to employ in borrowing money to solve a cash flow problem.[8] Hood agreed to borrow money from First Bank, utilizing this pre-approved credit line, and loan some of the proceeds to Clawson. Clawson assured Hood that the proposed arrangement was not improper or illegal. However, Clawson requested that Hood keep the transactions secret and Hood complied. A similar arrangement was made with Secor.

The fraudulent transactions took two forms. In Method I, Clawson prepared promissory notes representing loans from First Bank to Hood for "farm operating expenses." Hood executed the notes and deposited the loan proceeds into his First Bank checking account. Then Hood issued checks to Clawson. Clawson deposited the checks in his account and ultimately delivered promissory notes to Hood. In Method II, Clawson completed notes, signed by Hood in blank, without Hood's knowledge and deposited the proceeds directly into his own account.

First Bank's annual financial statements indicated that Hood borrowed $663,000.00, evidenced by promissory notes from First Bank on various occasions from April 2, 1976 to July 2, 1982, under the guise of drawdowns against a pre-approved credit line for "agricultural expenses." During the same period, Hood loaned Clawson money on twelve different occasions amounting to $373,308.17, evidenced by checks, and an additional $57,500.00, evidenced by notes signed in blank by Hood and completed by Clawson. Clawson executed promissory notes for $412,500.00 and $15,000.00. First Bank's annual financial statements, dated January 5, 1979, January 10, 1981 and January 8, 1982, disclosed that

from December 2, 1977 through May 18, 1982, eighteen loans were made by Secor to Clawson totaling $572,378.56 and at approximately the same time that Secor borrowed money from First Bank.

Clawson also managed commodity accounts and cattle feeding operations in Secor's name with Secor's money. Secor believed the funds were being utilized as a hedging account for the cattle business. However, Clawson traded commodities (i.e., invested in pork bellies and hog futures), against bank policy and without a license. Clawson received commissions entitled "management fees," amounting to one-half of the profits realized in the cattle and commodity transactions. Secor was never compensated for losses which the parties agreed to share.

Clawson's schemes created potential bank liability. When Hood and Secor demanded payment of the promissory notes, Clawson stated that he had no ability to pay. On January 3, 1983, Hood presented his claim to First Bank's Board of Directors. Clawson was fired on January 6, 1983 for perpetrating a fraud on First Bank and its customers, in violation of the banking laws. On January 7, 1983, First Bank became aware of the additional transactions involving Secor.

Secor, facing personal bankruptcy as a result of the fraudulent transactions, refused to make payments of interest on the notes representing loans from First Bank and threatened First Bank with suit for compensatory and punitive damages. Hood also refused to make payments on his notes and threatened to sue First Bank and its Board of Directors.[9] The directors were advised by counsel of First Bank's probable liability because Clawson was an employee acting on behalf of First Bank when he committed the dishonest and fraudulent acts.

was non-excludable under Rider SR6019 2(i). *First American State Bank v. Continental Ins. Co.,* No. 84–3001 at Appendix (N.D. Iowa, Dec. 14, 1988).

8. Iowa Code § 524.706(1)(a)(3) (1976) limited Clawson, as a bank officer, from borrowing

from First Bank. Clawson wanted to acquire funds for speculation in the land market.

9. MGIC Investment Corporation was the insurer on a directors and officers liability policy issued to First Bank.

First Bank filed proof of loss with Underwriter's Adjusting Company (UAC), Continental's agent, on February 4, 1983. On February 15, 1983, UAC denied coverage, on behalf of Continental.

First Bank entered into settlement negotiations with Hood and Secor which resulted in settlement agreements and mutual releases in an effort to avert potentially staggering compensatory and punitive damage awards. Clawson was required to transfer all non-exempt property, his profit sharing account and Mrs. Clawson's First American Group, Ltd. stock to First Bank in mitigation of damages.

Releases of all demands, dated May 19, 1983, were executed between First Bank and Hood, First Bank and the Clawsons (for claims arising out of the Hood notes), Hood and First Bank and its directors and officers, and the Clawsons and Hood and First Bank and its directors and officers. A conditional release, dated May 19, 1983, was executed between Hood and the Clawsons, contingent upon the material accuracy of the Clawsons' current inventory of assets and the Clawsons' acknowledgment of debt and agreement not to file bankruptcy for a ninety-one day period. The releases will be hereinafter referred to as the Hood Settlement.

On May 19, 1983, Hood settled his claims against First Bank. Hood received a check for $373,479.50 [10] which he used to repay his notes with First Bank. Hood's notes with First Bank were marked "paid." Hood received a check representing the proceeds of the sale of stock. Clawson's notes with Hood were cancelled.

First Bank suffered a loss of $373,308.17 through settlement as a direct result of Clawson's acts. First Bank's liability to Hood, incurred as a direct result of Clawson's dishonest and fraudulent scheme, totalled $373,308.17, the amount of the cancelled Clawson notes. At the time of settlement, Hood had a viable fraud claim against First Bank for the amount of the cancelled notes.

First Bank forgave Secor's notes, restructured his debt, and became assignee under Clawson's notes with Secor. On May 23, 1983, Secor settled his claims, executed notes for $375,000.00 and $172,672.14 secured by a land mortgage, and obtained a $150,000.00 line of credit subject to a crop lien. First Bank's liability to Secor amounted to $270,000.00, the amount of the forgiven Clawson–Secor notes not attributable to excludable potential income. First Bank was out $270,000.00 as a result of having to compensate Secor through settlement for the cancelled notes precipitated by Clawson's fraudulent scheme.

An Agreement and Release, dated May 23, 1983, between Secor and First Bank effected a mutual release. A Release, also dated May 23, 1983, among First Bank, Secor and the Clawsons, released all parties from liability arising out of their financial dealings. The Agreement and Release and the Release are hereinafter referred to as the Secor Settlement.

First Bank incurred $12,759.27 in attorneys' fees as a result of settlement negotiations with Hood and Secor. Continental was notified of the negotiations and the settlements.

First Bank filed final proof of loss on August 29, 1983 and Continental established a reserve [11] of $600,000 indicating that it believed losses were caused by Clawson in his capacity as a bank officer. However, Continental still denied coverage.

First Bank, among other claims, brought a breach of contract action against Continental in federal district court.[12] First Bank alleged breach of contract by Continental in denying coverage under the Bond for First Bank's losses which resulted directly from the dishonest and fraudulent acts of an employee.

---

**10.** First Bank issued a check to Hood for this amount to settle its perceived liability. But, the executed promissory notes are the only tangible evidence of loss upon which this court may rely.

**11.** This "reserve" was Continental's best professional estimate of the cost of the claim.

**12.** Jurisdiction was based on diversity pursuant to 28 U.S.C. § 1332 (1976).

## B. District Court

After a ten day bench trial, the district court concluded that the settled Hood and Secor claims, if established, would have constituted valid, collectible losses under the terms of the Bond, and therefore First Bank had incurred a covered loss of $519,415.82. The district court properly calculated First Bank's covered losses as follows:

| | |
|---|---|
| $373,308.17 | Total outstanding promissory notes from Clawson to Hood, evidencing transfer of fraudulently obtained loan proceeds |
| +270,000.00 | Total outstanding loans from Secor to Clawson, funded by fraudulently obtained loan proceeds |
| − 87,416.58 | Monetary value of Clawson pension plan |
| − 8,000.00 | Net gain from sale of Clawson corn |
| − 12,975.77 | Net gain from sale of Clawson real property |
| − 10,500.00 | Net gain from sale of Clawson vacant lot |
| − 5,000.00 | Bond deductible |
| $519,415.82 | COVERED LOSS |

First Bank proved by a preponderance of the evidence that as a direct result of Clawson's dishonest and fraudulent acts, a loss under the bond of $519,415.82 [13] was incurred, representing the total outstanding loans to Clawson through Hood and Secor reduced by the value of items received from Clawson in mitigation of damages including a pension plan, corn, real property and a vacant lot, and further reduced by the bond deductible.[14]

The district court found that First Bank incurred $12,759.27 in reasonable attorneys' fees during settlement negotiations. The district court further concluded that the settlement negotiations should be considered a "legal proceeding" within the meaning of the Bond, triggering an indem-nification right in First Bank, and awarded expenses. The district court also found that since First Bank had reasonably incurred $2,191.64 in attorneys' fees and expenses as a result of Continental's non-compliance with certain discovery orders, an imposition of personal monetary sanctions against Continental's trial counsel, Robert S. Milnikel, was warranted pursuant to Fed.R.Civ.P. 37(b)(2). Judgment was entered in favor of First Bank and against Continental for $532,175.09 (covered loss and settlement expenses) for breach of contract and against Milnikel for $2,191.64 as a discovery sanction. The court also awarded pre-suit and post-suit prejudgment interest to First Bank.[15] We will address Continental's challenges to the district court's judgment below seriatim.

## II. LOSS UNDER THE BOND

A bankers blanket fidelity bond covers two types of losses: (1) a direct loss of money, and (2) third party liability incurred. *Merchants–Produce Bank v. United States Fidelity & Guaranty*, 305 F.Supp. 957, 964 (W.D.Mo.1969). As a result of each fraudulent or dishonest act comprising the loan scheme, First Bank suffered direct loss and incurred third party liability.

Continental contends that the district court erred in concluding that First Bank sustained a loss under the Bond, when loan proceeds were transferred to Hood and Secor. Continental asserts that since Hood and Secor ultimately paid their debts to First Bank, no loss occurred.[16] We disagree.

---

**13.** See, *supra.* note 7.

**14.** Continental asserts on appeal that the district court erred in calculating the value of the property recovered from Clawson in mitigation of damages. First Bank reasonably disposed of the assets and applied proceeds to losses. Therefore, Continental was properly credited for mitigation purposes with the full amount First Bank realized on the sale of Clawson's assets.

**15.** First Bank was found to be entitled to pre-suit prejudgment interest at a 5% rate commencing from October 28, 1983, 60 days after the final proof of loss, and post-suit prejudg-ment interest at a rate of 10%. Iowa Code §§ 532.2 (1980) and 532.3 (1981). The court also found First Bank was entitled to post-judg-ment interest pursuant to 28 U.S.C. § 1961(a) and costs pursuant to 28 U.S.C. § 1920 and Fed.R.Civ.P. 54(d). Continental has not appealed the award of post-judgment interest and costs.

**16.** Ironically, both Continental's counsel and expert witness admitted that First Bank sustained a loss. Tr. at 1835 and 1963. However, Continental insisted that Hood's and Secor's claims fell within the purview of MGIC's directors and officers liability policy.

In Iowa, officers and employees of state-chartered banks are required to provide a bond to indemnify the bank against certain losses incurred as a result of "any act or acts of fraud, dishonesty, forgery, theft, larceny, embezzlement, wrongful abstraction, misapplication, misappropriation or other wrongful act committed by such officer or employee directly or through connivance with others, until all of the officer's or employee's accounts with the state bank shall have been fully settled and satisfied." Iowa Code § 524.705 (1970). The Bond in the instant case provided coverage for:

(A) *Loss resulting directly from one or more dishonest or fraudulent acts of an Employee,* committed anywhere and whether committed alone or in collusion with others, including loss of Property resulting from such acts of an Employee, which Property is held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor.

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts *committed by* such Employee *with the manifest intent:*

(a) *to cause the Insured to sustain such loss; and*

(b) *to obtain financial benefit for the Employee,* or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

Bankers Blanket Bond, Standard Form No. 24, No. BND 2 09 62 02, as amended by SR6019, dated November 1, 1977 (emphasis added).

We believe the district court was correct in concluding that Continental's bond was a statutory bond. *See American Trust & Sav. Bank v. United States Fidelity & Guaranty,* 418 N.W.2d 853, 854 (Iowa 1988). Therefore, the statute and the terms of the bond dictate Continental's lia-bility. *Id.* Furthermore, a statutory bond should be liberally construed by the interpreting court in light of the purpose for which it was created. *Id.*

In this case, Clawson solicited Hood and Secor to borrow money from First Bank and loan it to Clawson in circumvention of state banking regulations. Clawson falsified financial statements, signed in blank by Hood and Secor, to support fraudulent loan applications. Clawson utilized notes, signed in blank, to obtain loans from First Bank, allegedly on behalf of Hood and Secor, in the form of drawdowns designated as "agricultural expenses." Tr. at 803. The transactions were concealed at Clawson's request. Tr. at 800.

The Iowa Supreme Court has interpreted "dishonest" and "fraudulent," as used in section 524.705, broadly. *See F.D.I.C. v. Nat'l Surety,* 281 N.W.2d 816 (Iowa 1979). Furthermore, this court has repeatedly held that conduct may be "fraudulent" or "dishonest" within the meaning of a fidelity bond without constituting a federal offense. *See, e.g., First Nat'l Bank of Sikeston v. Transamerica Ins. Co.,* 514 F.2d 981 (8th Cir.1975); *Boston Securities, Inc. v. United Bonding Ins. Co.,* 441 F.2d 1302 (8th Cir.1971) (employee created conflict of interest and acted in own self-interest); *General Finance Corp. v. Fidelity & Casualty Co.,* 439 F.2d 981 (8th Cir.1971). Therefore, in this case, Clawson committed "dishonest" and "fraudulent" acts with the requisite intent to create a loss and reap financial benefit.

 The operative language of the Bond triggering liability, "loss resulting directly from," indicates a direct loss. Iowa law recognizes a per se direct loss occurring at the time of the initial wrongdoing, when bank funds are misapplied. *American Trust,* 418 N.W.2d at 855. "Losses" within the meaning of section 524.705 and "loss" under the Bond mean actual depletion of bank funds caused by an employee's dishonest acts. *Id.* First Bank sustained a direct loss as a result of each dispersal of funds under the fraudulent loan scheme engineered and executed by Clawson. Therefore, every loan designated as an ag-

ricultural expense which in fact became an indirect loan to Clawson resulted in a covered loss to First Bank because First Bank would be vicariously liable for losses to Hood and Secor from the unpaid Clawson notes. The funds expended to settle such liability directly resulted from Clawson's acts as a matter of law and therefore constituted covered losses under the Bond.

First Bank incurred potential third party liability as a result of Clawson's conduct. Therefore, it also incurred a loss when it expended funds to effect settlement, hereinafter referred to as settlement costs.

■ Continental's position that the Bond did not provide coverage for First Bank's settlement costs is contrary to established case law and the purpose of fidelity bank bonds. Fidelity bonds were intended to cover losses derived from vicarious liability. First Bank's liability to Hood and Secor was self-evident. Under Iowa agency law, if a principal places an employee in a position to commit a fraud on innocent third parties, liability of the principal arises from the resulting acts. *Mechanicsville Trust & Sav. Bank v. Hawkeye–Security Ins. Co.*, 158 N.W.2d 89, 91 (Iowa 1968).

Clawson was the agent of First Bank, a disclosed principal, clothed with the apparent authority as a bank officer to make loans. Clawson, in his capacity as a bank representative, approved, processed and dispensed bank loans to Hood and Secor. Clawson then executed promissory notes (on most occasions) in return for the transfer of a portion of the loan proceeds from Hood and Secor. Hood and Secor relied on Clawson's professional assertions that the loans were proper. Tr. at 887. Clawson created potential third party liability covered under the Bond for any damages directly resulting from Clawson's scheme. Clawson's inability to pay the notes imposed a loss on Hood and Secor and gave rise to a third party claim.

■ A settlement precipitated by claims of fraud or dishonesty and paid to a third party by the insured is a covered loss. *See Merchants–Produce Bank*, 305 F.Supp. at 964. Such a conclusion is supported by the doctrine of reasonable expectations, applicable to the construction of insurance policies under Iowa law. *Grinnell Mut. Reinsurance Co. v. Voeltz*, 431 N.W.2d 783 (Iowa 1988); *Gateway State Bank, N.A. v. North River Ins. Co.*, 387 N.W.2d 344 (Iowa 1986). We uphold the district court's finding that First Bank's settlement costs were covered under the Bond.

### III. "LEGAL PROCEEDING" UNDER THE BOND

■ Continental challenges the district court's conclusion that "legal proceeding" within the meaning of the Bond [17] triggering an indemnification right in the insured included settlement negotiations. As a result of its holding, the district court found that First Bank was entitled to $12,759.27 in reasonable attorneys' fees incurred through settlement. We agree.

The phrase "legal proceeding" as used in the Bond is not ambiguous. The Bond provides that reasonable attorneys' fees are recoverable by an insured if expended in defending "any suit *or* legal proceeding." Therefore, the Bond does not limit the scope of "legal proceeding" to formally commenced lawsuits as Continental contends.

■ In addition, Iowa law recognizes the doctrine of reasonable expectations in the construction of insurance contracts. *Grinnell Mut. Reinsurance Co.*, 431 N.W.2d at 786. First Bank was reasonable in expecting that the Bond would cover legal expenses incurred in settling Hood's threatened lawsuit and Secor's viable claims because it would have covered attorneys' fees

---

**17.** Part D of the General Agreements section of the Bond provided in pertinent part:

The Underwriter will indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending *any suit or legal proceeding* brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this Bond (emphasis added).

incurred as a result of litigation under the same circumstances.

We find the district court properly interpreted "legal proceeding" to include settlement negotiations, triggering coverage under the indemnification provision of the Bond for reasonable attorneys' fees incurred. Therefore, the district court correctly awarded First Bank attorneys' fees of $12,759.27.

## IV. APPORTIONMENT

We believe the award of $12,759.27 for attorneys' fees incurred during settlement negotiations should have been apportioned between the insurance carriers, Continental and MGIC Indemnity Corporation (MGIC). MGIC, originally a party[18] to the instant action, was the insurer under a directors and officers personal liability policy, which insured First Bank against monetary losses as a result of claims against officers and directors for their wrongful acts.

In 1983, First Bank had advanced settlement funds and incurred expenses to quiet claims against itself and its directors and officers. MGIC's liability was implicated because Hood and Secor had claimed that the directors and officers exercised improper judgment in the employment, supervision and control of Clawson and practiced conscious avoidance of knowledge regarding the fraudulent transactions. Therefore, the settlements furthered MGIC's interest in limited liability.

MGIC stated in its summary judgment motion that it had agreed to pay the legal expenses incurred in representing the directors and officers during settlement negotiations. Counsel was specifically instructed to equitably allocate any attor-

neys' fees because First Bank's costs of defense and liability were not covered under the MGIC directors and officers liability policy. Therefore, it was the reasonable expectation of the parties that the costs of settlement would be apportioned.

Subsequently, MGIC was sold, its name was changed to WMBIC Indemnity Corporation (WMBIC) and WMBIC was ordered into liquidation, on June 28, 1985, pursuant to Chapter 645 of the Wisconsin statutes. MGIC was properly dismissed because First Bank's action abated pursuant to the operation of Wisconsin statute § 645.49(1) (1979)[19] and Iowa Code § 507C.24 (1984),[20] since the present action was not included in the liquidation order.

The Hood settlement disposed of potential director and officer liability, triggering the indemnification provision of the MGIC Bond. However, since MGIC was no longer a party to the instant action no apportionment by the district court was possible. Therefore, Continental must sue out a contribution claim in the MGIC liquidation proceeding in Wisconsin. We affirm the district court's judgment against Continental awarding First Bank attorneys' fees.

## V. INTEREST

Continental contends on appeal that the district court should not have awarded First Bank pre-suit prejudgment interest from October 28, 1983 to January 4, 1984 and post-suit prejudgment interest from January 4, 1984 to December 14, 1988. We disagree and affirm the district court's award.

Prejudgment interest is a matter of substantive state law. *See, e.g., Drovers*

18. *First American State Bank v. Continental Ins. Co.,* No. 84–3001 (N.D. Iowa Feb. 20, 1986) (dismissal order). MGIC was dismissed from this action on February 20, 1986 when it was sold, underwent a name change and was ordered into liquidation pursuant to Wis.Stat. § 645.01–645.90 (1980).

19. Wisconsin statute § 645.49 provides that: [u]pon issuance of any order appointing the commissioner liquidator of a domestic insurer or of an alien insurer domiciled in this state all actions and all proceedings against

the insurer whether in this state or elsewhere shall be abated....

20. Iowa Code § 507C.24 provides that Iowa courts:
shall give full faith and credit to injunctions against the liquidator or the insurer or the continuation of existing actions against the liquidator or the insurer, when the injunctions are included in an order to liquidate an insurer issued pursuant to corresponding provisions in other states.

*Bank of Chicago v. Nat'l Bank,* 829 F.2d 20 (8th Cir.1987); *Weitz Co. v. Mo–Kan Carpet, Inc.,* 723 F.2d 1382 (8th Cir.1983). In Iowa, both pre-suit and post-suit prejudgment interest are governed by statute. Iowa Code § 535.2 (1980); Iowa Code § 535.3 (1981). By its terms section 535.3 makes the awarding of prejudgment interest obligatory. *State v. Lohr,* 266 N.W.2d 1, 5 (Iowa 1978).

Iowa Code § 535.2(1)(a) and (b) provides that the rate of interest shall be five percent on "money due by express contract" and "money after the same becomes due."

■ The district court found as a matter of law that money became "due" under the Bond on October 28, 1983, sixty days after First Bank submitted its final proof of loss. *See Mechanicsville Trust & Sav. Bank v. Hawkeye–Security Ins. Co.,* 158 N.W.2d 89, 93 (Iowa 1968). On that date a cause of action vested in First Bank for "money due under an express contract" or "money after the same becomes due." Iowa Code § 535.2. Therefore, the district court correctly awarded First Bank five percent presuit prejudgment interest calculated from the date the cause of action arose to the date of suit, January 4, 1984.

■ In all other cases, Iowa Code § 535.3 fixes the rate of interest at ten percent and provides that interest will accrue from the date the action is commenced. Section 535.3 relevantly provides that "[i]nterest shall be allowed on all money due on judgments and decrees of courts at the rate of ten percent per year.... The interest shall accrue from the date of the commencement of the action." Therefore, the district court properly concluded that Iowa Code § 535.3 controlled post-suit prejudgment interest and correctly awarded ten percent interest from January 4, 1984.

## VI. ADMISSIBILITY OF THE EVIDENCE AND VENUE

Continental claims that errors with regard to venue, and evidentiary and procedural rulings, resulted in an unfair trial below. As to the venue issue, this court previously reviewed Continental's petition for a writ of mandamus regarding venue and denied relief. Order, No. 88–1558 (8th Cir. Apr. 15, 1988). The venue issue raised on appeal involving the same parties and the same cause of action is res judicata. Therefore, we are bound by our previous decision and do not reach the issue.

In regard to Continental's claim of potential error in the district court's evidentiary and procedural rulings, this court has established standards for the conduct of bench trials. *See Fields Engineering & Equipment v. Cargill, Inc.,* 651 F.2d 589 (8th Cir.1981); *Builders Steel Co. v. C.I.R.,* 179 F.2d 377 (8th Cir.1950). *Builders Steel* first established that a judgment in a bench trial would not be reversed on the grounds that incompetent evidence was admitted, unless the competent evidence provided insufficient support for the judgment or the incompetent evidence precipitated a finding that the trial court would not otherwise have made. As this court pointed out in *Fields Engineering,* the admission of incompetent evidence is usually harmless because there is a presumption that the trial court considered only competent evidence in making findings.

The stricter *Builders Steel* standard for reversal on the grounds that incompetent evidence was admitted should apply to Continental's claims that the trial judge improperly imposed a continuing objections rule and abused his discretion in limiting cumulative and repetitive proof because the rulings resulted in the admission of potentially inadmissible evidence. The district court requested that objections should not be made or argued with the rationale that all proper objections would be considered *in pectore judicis.* Appellants also claim that the district court erred in directing available witnesses not to testify if they had been previously deposed. The court also allegedly condoned the use of leading questions and refused to direct witnesses to answer on several occasions when requested to do so. Tr. at 275, 958, 983, 1011, 1083 and 1112. We find that the district court's rulings were not an abuse of discretion and did not render the trial

unfair under the standard set forth in *Builders Steel.*

## VII. POTENTIAL INCOME EXCLUSION

■ First Bank cross-appeals alleging that the district court erred in ruling that the potential income exclusion contained in Rider SR6019 2(i) of the Bond operated to exclude from coverage $302,378.56 in future interest payments, a portion of First Bank's claimed loss as a result of the First Bank–Secor–Clawson loans. We disagree and affirm.

The potential income exclusion expressly included interest not realized by the insured. The Bond in Rider SR6019 2(i) provided that "[i]n addition to the existing exclusions ..., the Underwriter shall not be liable ... for: (i) Potential income, including but not limited to interest and dividends, not realized by the Insured because of a loss covered under this bond."

First Bank restructured Secor's debt and sustained a loss of future interest. These payments were not yet due, not realized, and therefore fell squarely within the potential income exclusion. The potential income exclusion is not ambiguous with regard to the treatment of future interest. Therefore, this court is compelled to construe the provision according to its plain meaning and conclude that First Bank's interest losses incurred through the restructuring of Secor's debt in settlement were properly excluded from coverage under the potential income exclusion.

In addition, even absent an explicit potential income exclusion, no compensable loss occurred. Future interest payments did not represent a depletion of funds, a direct

loss resulting from a dishonest act. Since the Bond's coverage is limited to loss directly resulting from a dishonest act, *American Trust,* 418 N.W.2d at 855, the loss of future interest income forfeited in settlement was not a covered loss.

## VIII. RULE 37 PERSONAL MONETARY SANCTIONS

■ Continental's counsel, Robert S. Milnikel, appeals the imposition of personal monetary sanctions, pursuant to Fed.R. Civ.P. 37(b)(2),[21] consisting of $2,191.64 in reasonable expenses incurred by First Bank as a result of Continental's substantially unjustified and willfully delayed noncompliance with certain pretrial discovery orders. We uphold the imposition of personal monetary sanctions against Mr. Milnikel on a record replete with egregious discovery abuse. Continental repeatedly attempted to thwart First Bank's efforts to garner information relating to Continental's involvement in previous fidelity bond claims litigation, policies and procedures for dealing with claims including Continental's "training manual," and annual financial statements.

### A. Interrogatory No. 25

On February 27, 1987, First Bank served Plaintiff's First Set of Interrogatories, including Interrogatory No. 25[22] on Continental. Continental did not answer the interrogatories nor seek an extension of time or a protective order. First Bank corresponded with Mr. Milnikel, Continental's trial counsel, admonishing Continental's tardiness, and attempted to informally resolve the dispute by twice granting a one

---

**21.** Rule 37(b)(2) provides in pertinent part:
 In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

**22.** Interrogatory No. 25 requested that Continental state:

[W]hether the defendant, the Continental Insurance Company, has been a party to any litigation with respect to fidelity bond claims within the past ten years; and if so, provide: the name and docket number of each such case; the court in which each such action was brought; the basis for the claim set forth in each such action; the date each such action was filed; and the disposition of each such case.

week grace period, pursuant to Northern District of Iowa Local Rule 2.2.5.

On September 11, 1987, Continental sent First Bank terse "draft answers" to the February 27, 1987 interrogatories [23] with an indication that filing would occur shortly. In a telephone conference one month later, Continental again assured First Bank the answers would be presently filed. In response to continued non-compliance, First Bank filed a Motion for a Default Judgment, on October 30, 1987, pursuant to Fed.R.Civ.P. 37(d).

On December 31, 1987, in response to several pending First Bank motions to compel compliance, the magistrate [24] issued an order (the December 31 order) requesting that Continental produce information regarding all fidelity bond lawsuits during the previous ten years by January 1, 1988. Continental responded by designating persons with the requisite knowledge. On February 28, 1988, First Bank filed a motion to enforce the December 31 order.

A final pretrial conference was held on March 4, 1988, at which time Continental had not complied with the December 31 order. On March 18, 1988, First Bank moved to expand the December 31 order, and filed a second motion requesting an order requiring compliance by April 4. The court ruled in its April 6 order that:

> At the final pre-trial conference, defendant represented that it was in the process of gathering the information requested by the plaintiff with respect to litigation to which the Continental Insurance Company has been a party in the last ten years concerning fidelity bond claims. Counsel for defendant represented that its findings pursuant to this request would be available within the following week. This information was requested in plaintiff's interrogatory number 25 and had been compelled by the court on December 31, 1987. The court left the final pre-trial conference

with the distinct impression that defendant would provide this information within a few days. Now, the defendant states that the "drumbeat of pressure" to provide this information causes it to conclude that it should not be provided. This information must be provided immediately.

Mr. Milnikel repeatedly told the court that the compilation process was occurring and made incomplete productions.

### B. Fidelity Bond Claim Adjustment Manual

Continental had been requested to produce information regarding policies and procedures for adjustment of fidelity bond claims, including Continental's "training manual," in Plaintiff's Rule 30(b)(6) Notice of Taking Deposition, dated November 2, 1987. First Bank requested that Continental produce any manual or accumulation of policies and procedures. Milnikel repeatedly denied knowledge of the existence of a "training manual."

On March 4 at the final pretrial conference, the magistrate requested any "discrete" collection of policies and procedures. Thereafter, on March 24, Continental produced portions of a "training manual" relating to the adjustment of fidelity bonds from a 1981 seminar. However, Continental withheld documents referenced therein, including customer service instruction standards for handling claims, forms and an appendix.

After requesting complete information, First Bank moved on April 4, 1988 to compel compliance with the December 31 order. The motion was granted and the final pretrial order, issued on April 6, 1988, required Continental to immediately produce any manuals or accumulation of policies and procedures employed in the adjustment of fidelity bond claims. In its April 6 order the magistrate mandated that "[i]f the defendant has any manual or accumulation of policies and procedures for the handling of

---

**23.** In response to Interrogatory No. 25, Continental responded:

> Yes, but the details are not available and would be unduly burdensome to collect and that part of the interrogatory is objected to.

**24.** The Honorable John A. Jarvey, United States Magistrate for the Northern District of Iowa.

fidelity bond claims, it must provide them immediately to the plaintiff. Defendant should err in favor of disclosure." Continental complied by producing irrelevant documents at trial.

### C. Annual Financial Statement

In the magistrate's April 6 order, Continental was ordered to "immediately" produce its current financial statement or most recent annual report. The report was produced the first day of trial. We do not believe that the district court incorrectly concluded appellant's justification for delay, that financials were not readily available and would be difficult to compile, was merely a delay tactic.

### D. Sanctions

Continental's non-compliance with the April 6 final pretrial order caused First Bank to incur expenses. On April 18, 1988, First Bank moved for sanctions under Fed. R.Civ.P. 37(b)(2). The district court granted First Bank's motion and ordered Mr. Milnikel to personally pay reasonable expenses, incurred after the pretrial conference as a result of Continental's failure to comply with the April 6 order.

Fed.R.Civ.P. 37(b)(2) provides for monetary sanctions of reasonable expenses, including attorneys' fees, for willful failure to obey a discovery order. The non-complying party must show that the failure to comply was justified, *Palma v. Lake Waukomis Dev. Co.*, 48 F.R.D. 366 (W.D.Mo. 1970), or that special circumstances make an award of expenses unjust. The record does not indicate that non-compliance was justified or that the imposition of sanctions would be unjust. The record demonstrates that Continental's failure to comply was not due to mere inability, but the court believed Milnikel was acting willfully and in bad faith.

Sanctions are an invaluable penalty and deterrent to be employed by district courts to thwart discovery abuse. The type of Rule 37 sanction imposed is discretionary and should not be reversed absent an abuse of discretion. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639,

96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204 (8th Cir.1973) (en banc).

We have reviewed the entire record and find that the district court did not abuse its discretion in imposing personal monetary sanctions on counsel. The explanations offered by appellant Milnikel are specious and should have been addressed to the district court in an attempt to meet appellant's burden of proving substantial justification or an unjust imposition under the circumstances. Milnikel was afforded fair notice and an opportunity to be heard below. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

We agree with the district court's imposition of personal monetary sanctions on trial counsel, on the basis of a deplorable discovery record below which indicated that Milnikel was at fault for the non-compliance, and that non-compliance was willful and in bad faith on counsel's part, or at least substantially unjustified. The district court did not abuse its discretion. We find Milnikel's arguments on appeal to be meritless. Therefore, we affirm the district court's judgment imposing Rule 37 personal monetary sanctions on trial counsel.

### CONCLUSION

For all the foregoing reasons, we affirm the district court's $532,175.09 judgment in favor of First Bank. We find that the district court properly awarded attorneys' fees incurred in settlement negotiations under the Bond's indemnification provision. We agree with the award of pre-suit and post-suit prejudgment interest. On First Bank's cross-appeal we affirm. The district court correctly concluded that future interest forfeited through settlement constituted potential income, specifically excluded from coverage under the Bond. Finally, we uphold the imposition of Rule 37 sanctions precipitated by substantially unjustified and willful non-compliance with several discovery orders and conclude that the district court did not abuse its discre-

tion in entering a judgment of personal monetary sanctions against trial counsel.