FIRST DAKOTA NATIONAL BANK, formerly doing business as American State Bank, a national bank, Appellant/Cross–Appellee,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY, Appellee/Cross–Appellant.

Nos. 91–3020, 91–3034.

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1992.

Decided July 14, 1993.

Stephen M. Johnson, Yankton, S.D., argued and on brief (Celia Miner and Michael F. Marlow, on the brief) for appellant/cross-appellee.

Roderick Dean Blanchard, Minneapolis, MN, argued and on brief (Carl D. Knudson and Thomas H. Crouch, and Paul T. Barnett, Sioux Falls, SD, on the brief) for appellee/cross-appellant.

Before FAGG, Circuit Judge, HENLEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

HANSEN, Circuit Judge.

This is a banker's bond case. First Dakota National Bank (First Dakota), after buying the failed American State Bank (American Bank), sued St. Paul Fire & Marine Insurance Company (St. Paul) for losses allegedly caused by dishonest former employees of American Bank and sought recovery under two fidelity bonds issued to American Bank by St. Paul. The case went to trial and the jury found in favor of First Dakota on 12 of its 14 claims against St. Paul. The district court granted St. Paul's posttrial motion for judgment as a matter of law on four of the 12 claims that the jury had found in favor of First Dakota. Both parties appeal. We affirm in part, reverse in part, and remand.

I. Facts

American Bank, a small, state-chartered bank operating in Yankton, South Dakota, was owned by American Banshares, Inc., a closely held bank holding company. In 1984, William Deam became President and Chief Executive Officer (CEO) of American Bank. Unbeknownst to the bank's stockholders, depositors, or bank regulators, Deam was involved in a fraudulent scheme to divert bank funds to his own personal use. During the scheme, Deam's ownership in the holding company increased from 8.3% to 45% between 1983 and 1986. Three other American Bank officials were involved in the scheme during this period of time: Executive Vice-President Karen Kay Langley; Vice-President James Sletten; and Trust Officer Steve Capitanio.[1] Deam, Langley, and Sletten each pled guilty to federal criminal violations.

The fraudulent scheme was extensive and consisted of transactions between and among 28 different corporations or entities.

In August 1986, the Federal Deposit Insurance Corporation (FDIC) began investigating American Bank. On March 3, 1987, upon completion of their investigation, the FDIC examiners met with American Bank's Board of Directors. The FDIC examiners informed the board that several bank officers were engaging in self-serving conduct that weakened the bank's asset portfolio. The examiners also cited numerous apparent violations of federal banking laws and regulations.

Based on its examination findings, the FDIC issued a temporary cease and desist order against William Deam on April 14, 1987. Two months later, the FDIC released the results of the American Bank examination to the public. Shortly thereafter, William Deam resigned as President and CEO of American Bank. John Lillibridge, Chairman of the Board of First Fidelity Bank in Burke, South Dakota, became interim president of American Bank in September 1987.

Unaware at the outset of the extent of Deam's scheme, Lillibridge quickly learned. In early September 1987, when a depositor at American Bank demanded to see his $600,000 certificate of deposit which the American Bank was holding in escrow, Lillibridge discovered that Deam had cashed it in. Lillibridge immediately contacted Lawrence Piersol, an attorney hired by American Bank. After an investigation, Piersol notified St. Paul on September 10, 1987, for a claim on this loss. St. Paul concedes this fact. *See* St. Paul's brief at 42.

After further investigation into Deam's past activities, American Bank then filed formal proofs of loss on December 29, 1987. On February 19, 1988, in accordance with the terms of the fidelity bonds, St. Paul notified American Bank that the bonds' coverage would terminate on April 19, 1988. American Bank subsequently filed a revised proof of loss with St. Paul on August 1, 1988.

---

1. This appeal involves only the actions of Deam and Langley. First Dakota dismissed before trial the two claims involving Sletten. Also, First Dakota does not appeal the district court's grant of judgment as a matter of law in favor of St. Paul on the claim involving Capitanio.

In 1988, First Dakota contacted the FDIC and expressed an interest in merging with or, in effect, purchasing American Bank. Trial transcript (Tr.) at 189. Because American Bank's liabilities were greater than its assets, First Dakota requested a substantial amount of money from the FDIC to finalize the merger. *Id.* The FDIC agreed and contributed $4,275,000 to First Dakota. *Id.* As an additional condition of the merger, First Dakota was obligated to seek reimbursement for losses allegedly caused by Deam and other American Bank officers. Tr. at 190. The agreement specified that the FDIC would receive 70% of the recovered losses and First Dakota would receive the remaining 30%. Tr. at 191. The purpose of this repayment schedule was to reimburse the FDIC for the money it paid to First Dakota to finalize the merger. *Id.*

First Dakota filed this civil complaint against St. Paul on March 22, 1989, and the trial commenced on May 7, 1991. First Dakota sought recovery from St. Paul for losses sustained by American Bank on 14 separate transactions.[2] On May 30, 1991, the jury found in favor of First Dakota on 12 of the 14 claims and in favor of St. Paul on the two remaining claims, namely the Business Expense claim and the Emmick claim. The district court, however, after the verdicts, granted judgment as a matter of law to St. Paul on four claims (the Northern Extrusions claim, the Unauthorized Dividend claim, the First Bancwest Devco, Inc. claim, and the Steve Capitanio claim). *See First Dakota Nat'l Bank f/d/b/a American State Bank, a national bank v. St. Paul Fire & Marine Ins. Co.,* No. CIV 89–4047 (D.S.D. filed Aug. 9, 1991) (amended order on motions). On August 20, 1991, the district court awarded judgment in favor of First Dakota for a total of $4,392,182.26.[3] *See id.* No. CIV 89–4047 (D.S.D. filed Aug. 20, 1991) (second amended

judgment in a civil case). Both parties appeal and raise a salmagundi of issues.

II. Discussion

A. Statute of Limitations

St. Paul issued two bonds to American Bank insuring against losses resulting directly from dishonest or fraudulent acts committed by an American Bank employee acting alone or in collusion with others. In order to recover under the specific terms of the bond, the insured was required to notify St. Paul of a loss "at the earliest practicable moment not to exceed 30 days after the discovery of a loss." *See* St. Paul's app. at 30 (financial institution bond (bond)). Within six months after the discovery, the insured was required to furnish St. Paul with a proof of loss. *Id.* Finally, the insured was required to initiate legal proceedings, if necessary, within 24 months after discovery of a loss. *Id.* "Discovery" is defined as the time "when the insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known." *See id.* at 29.

The jury, by way of special interrogatories, found that the insured complied with the bond's specific notification and discovery provisions. Specifically, the jury found that the insured notified St. Paul "as soon as practicable" and also that this notification was within 30 days after discovering the loss. *See First Dakota Nat'l Bank f/d/b/a American State Bank, a national bank v. St. Paul Fire & Marine Ins. Co.,* No. CIV 89–4047 (D.S.D. filed May 30, 1991) (jury verdict). The jury was not required by the interrogatories to specify the exact date upon which American Bank should have reasonably assumed that an insured loss had been incurred; in other

---

**2.** The 14 transactions were identified by the district court under the following names: Unauthorized Dividend; Northern Extrusions; Bancomp Services, Inc.; American Enterprises, Inc.; Clearfield Development; North American Storage; Leasing Companies; Oyate, Inc.; Cessna Airplane Purchase; Midwest Publishing, Inc.; First Bancwest Devco, Inc.; Steve Capitanio; Business Expense; and Emmick.

**3.** This total consists of $3,337,452.77, which is the combined amount of the remaining eight claims awarded by the jury, plus $1,045,610.00 for prejudgment interest, plus $9,119.49 for court costs.

words, the exact date when a loss was discovered.

St. Paul argues that First Dakota failed to file this lawsuit within 24 months after discovering a loss and, therefore, is barred from any recovery. Notwithstanding the fact that the jury specifically found that American Bank timely notified St. Paul "as soon as practicable" and also within 30 days after discovering an insured loss, St. Paul contends that on either January 17, 1986, or on March 3, 1987, American Bank discovered facts sufficient as a matter of law to conclude that an insured loss had occurred. Because the discovery of a covered loss allegedly occurred more than 24 months before First Dakota actually filed its complaint on March 22, 1989, St. Paul contends that First Dakota's lawsuit is entirely barred by the bond's two-year statute of limitations provision.

■ The January 17, 1986, date relied on by St. Paul is when the American Bank board met and discussed the results of a 1985 South Dakota State Examination Report (state report). In the state report, the board learned that American Bank had paid more than the net book value of the identifiable assets and liabilities of three leasing companies and a security title company when the Bank acquired them. All of the businesses had been part of Deam's holdings. Also, the board learned then that the state examiners "criticized" this transaction principally because American Bank had included the purchased business's goodwill as an asset on its financial sheets. St. Paul claims that these facts were sufficient to cause a reasonable person to assume that a covered loss had been incurred. Under St. Paul's argument, therefore, First Dakota had until January 17, 1988, which is 24 months after American Bank allegedly should have discovered the loss, to bring its lawsuit.

After reviewing the voluminous trial transcript, we hold that there was not sufficient evidence to conclude as a matter of law that discovery occurred on January 17, 1986. On that date and based on the state report, American Bank did not become aware of facts sufficient to cause a reasonable person to assume that a loss covered by the fidelity bonds had been incurred. St. Paul contends that the state's criticism of American Bank's inclusion of goodwill as an asset and of the more than net book value price premium paid for the leasing companies was sufficient for American Bank to have assumed that a loss covered under the bond had been incurred; in other words, that American Bank had discovered a loss. The evidence does not support this contention. Russell Andrews, the South Dakota state examiner, when asked on cross-examination regarding the premium paid by American Bank, stated that these leasing companies could have a fair market value in excess of their net book value. Tr. at 928. Regarding the inclusion of goodwill as an asset, Andrews stated that the state simply wanted American Bank to change how it reflected the bank's assets. Tr. at 930. Although American Bank could still reflect those assets on its financial statements, the state wanted to know how much of the goodwill asset was considered to be an intangible asset. *Id.* Andrews also stated that there was no proof of dishonesty by American Bank officials at that time. Tr. at 929. In our judgment, the facts known by American Bank on January 17, 1986, were not sufficient as a matter of law to cause a reasonable person to assume an insured loss had been incurred so as to trigger the bond's two-year statute of limitations provision.

■ St. Paul next argues that knowledge held by key employees and officers and obtained in the course of their employment can be imputed to the American Bank board of directors. *See First Nat'l Bank of Sikeston v. Transamerica Ins. Co.,* 514 F.2d 981 (8th Cir.1975). In effect, St. Paul argues that Deam and Langley's knowledge of their own fraudulent conduct should be imputed to the board. Under this theory, St. Paul argues that the American Bank board should be held to have discovered a loss by January 17, 1986. We disagree.

In *Sikeston,* it was apparent that other bank officers knew of the bank president's fraudulent conduct. Bank officers knew that the president was part owner of Gibson Livestock and that he authorized an immediate line of credit to Gibson Livestock on checks deposited but not yet collected. *Id.* at 986. The bank had previously been advised by the

Comptroller of the Currency that this credit extension constituted a blatant conflict of interest, that this practice should be immediately discontinued, and that its president should resign. *Id.* The president, however, refused to resign, and the bank did not fire him. *Id.* Also, after the president eventually resigned several months later, the bank knew that a bank employee was telling the now ex-president on a daily basis the amount of money necessary to cover Gibson Livestock checks received that day. *Id.* It was apparent that Gibson Livestock was issuing checks which exceeded its closing balance on the date of issue by a substantial amount of money. *Id.* This court imputed to the bank the knowledge that Gibson Livestock was engaged in a fraudulent check kiting scheme and that the bank's ex-president was a major participant in the scheme. *Id.* We concluded that this knowledge was sufficient to trigger the termination clause concerning the fidelity bond.

In our view, this case is factually distinguishable from *Sikeston.* The key difference is the lack of knowledge held by the American Bank board of directors about the true nature of Deam's fraudulent activities. Additionally, knowledge of key officers cannot be imputed to a board of directors when the officers' interests are adverse to the bank's interests. *Id.* at 986. In this case, Deam's interests were adverse to those of American Bank. In summary, we conclude that Deam and Langley's knowledge of their own fraudulent conduct cannot be imputed to the American Bank board of directors.

■ The March 3, 1987, date is when the FDIC met with the six-member board of American Bank and discussed the results of its August 1986 examination. In addition to the board members, the following persons also attended this meeting: (1) David Knudson, an attorney hired by American Bank; (2) David L. Zimbeck, South Dakota Division of Banking and Finance's legal counsel; (3) John J. Rubin, FDIC Senior Regional Attorney; (4) Richard D. Jarvis, Assistant FDIC Regional Director; (5) Dawn S. Meyers, FDIC Review Examiner; and (6) the FDIC examiner-in-charge. The examiners informed the board of the bank's weakened financial condition and of the transactions that resulted in numerous apparent violations of federal banking laws and regulations. *See* First Dakota's app., Tab 12 at 1 (FDIC report). The examiners also informed the board that the FDIC would pursue formal enforcement action and that they would recommend an assessment of civil monetary penalties against American Bank that could total $1,000 per day. *Id.*

In addition to determining what facts about this case were known to American Bank on March 3, 1987, we must also review the legal standard for determining when "discovery" has occurred for the purposes of liability under the fidelity bonds. *See First Sec. Sav. v. Kansas Bankers Sur. Co.,* 849 F.2d 345, 349 (8th Cir.1988). " '[D]iscovery' of fraud or dishonesty is deemed to occur when the insured actually becomes aware of sufficient facts which would lead a reasonable person to believe that an insured loss has occurred." *Id.* (quoting *Perkins v. Clinton State Bank,* 593 F.2d 327, 334 (8th Cir.1979) (citations omitted)). Mere suspicion of loss by the insured is not sufficient to trigger the notice requirement. *Id.* at 350. "The well established rule is that the insured under a blanket employee's fidelity bond is not bound to give notice until he has acquired knowledge of some specific fraudulent or dishonest act." *Id.* at 349. In other words, the bank must have actually discovered the loss. *Perkins,* 593 F.2d at 334 (citing *American Employers' Ins. Co. v. Cable,* 108 F.2d 225, 227 (5th Cir.1939)). Neither negligence nor any failure to discover what by due diligence might have been discovered will bar an insured from recovering the loss. *Id.*

We hold that there was not sufficient evidence to conclude as a matter of law that American Bank was aware of sufficient facts as of March 3, 1987, to have discovered that a covered loss under the fidelity bond had been incurred. American Bank might well have been suspicious on March 3, 1987, that it had incurred a loss. Mere suspicion, however, does not constitute discovery. *Id.* In our view, the facts known by American Bank were not sufficient as a matter of law to lead a reasonable person to assume that a loss caused by employee fraud or dishonesty, as

opposed to a loss caused by poor banking practices, actually had been incurred. For example, FDIC chief examiner Dean Radach testified that no final conclusions were reached at the March 3, 1987, meeting concerning any charges of fraud or dishonesty. Tr. at 641. We conclude that there is sufficient evidence to sustain the jury's finding that the insured timely notified St. Paul pursuant to the terms of the fidelity bond. Consequently, we also conclude that First Dakota filed its complaint within two years after discovering that a loss had been incurred pursuant to the bond's two-year statute of limitations provision.[4]

B. Validity of Bond's Manifest Intent Requirement

Under the terms of the bond, an insured is covered for only such dishonest or fraudulent acts committed by an employee with the manifest intent (1) to cause American Bank a loss and (2) to obtain a financial benefit for the employee or some other person or entity. *See* St. Paul's app. at 21 (bond). If the loss results from a loan, the employee must have been in collusion with one or more of the parties to the loan and must have received in connection therewith a financial benefit of at least $2,500. *Id.*

■ First Dakota contends that the manifest intent requirement included in the fidelity bond is contrary to South Dakota law and, therefore, that the district court erred in requiring it to prove that Deam and Langley committed fraudulent or dishonest acts with the manifest intent to cause First Dakota a loss and to obtain at least a $2,500 benefit. We disagree.

The district court held that the fidelity bond is a statutory bond under South Dakota law. *See* S.D.Codified Laws Ann. § 51–17–36 (1987). That section does not require a showing of manifest intent nor does it require that the fraudulent or dishonest employee obtain a financial benefit of at least $2,500. Instead, the additional requirements imposed on an insured to prove that an employee acted with manifest intent to cause a

loss and to obtain at least a $2,500 benefit are specifically enumerated in the fidelity bond.

We conclude that the fidelity bond's additional requirements of manifest intent and of the $2,500 benefit are legally enforceable under South Dakota law. First, the South Dakota Director of Banking and Finance approved St. Paul's fidelity bond as written. *See* St. Paul's app. at 82 (bond approval). Second, these two additional requirements under the fidelity bond are not inconsistent with the underlying purpose of § 51–17–36. Consequently, we conclude that the district court correctly required First Dakota to prove that a dishonest or fraudulent employee acted with manifest intent to cause a loss and to obtain at least a $2,500 benefit when the loss results from a loan.

C. Judgment as a Matter of Law

The district court granted St. Paul's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 on four claims: the Unauthorized Dividend claim, the Northern Extrusions claim, the First Bancwest Devco, Inc. claim, and the Steve Capitanio claim. First Dakota appeals only the Unauthorized Dividend claim and the Northern Extrusions claim and argues that the district court clearly erred in granting judgment as a matter of law.

■ In reviewing a grant of judgment as a matter of law, we must determine whether there is sufficient evidence to support the jury's verdict. *White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992). We must (1) consider the evidence in the light most favorable to First Dakota, (2) assume that all conflicts in the evidence were resolved in favor of First Dakota, (3) assume as proved all facts that First Dakota's evidence tended to prove, and (4) give First Dakota the benefit of all favorable inferences that may reasonably be drawn from the facts proved. *See id.* A motion for judgment as a matter of law " 'should be granted only when all the evidence points one way and is susceptible of

---

4. The district court held that the bond's two-year statute of limitations provision is void under South Dakota law. St. Paul argues that the bond's limitations provision is valid. We decline

to address this issue of South Dakota law because its determination has no effect on our analysis.

no reasonable inferences sustaining [First Dakota's] position.'" *Frieze v. Boatmen's Bank of Belton,* 950 F.2d 538, 540 (8th Cir. 1991) (quoting *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404, 1407 (8th Cir.1987)).

### 1. The Unauthorized Dividend Claim

■ The jury found in favor of First Dakota on the Unauthorized Dividend claim and awarded $470,000. The district court granted St. Paul's motion for judgment as a matter of law on this claim. We reverse the district court and reinstate the jury award with regard to the Unauthorized Dividend claim.

On June 10, 1986, the American Bank board convened its monthly meeting and William Deam informed the board members that American Banshares, Inc., the bank's holding company, had a "small bill" that needed to be paid. Tr. at 1562. The holding company supposedly needed dividend income from the bank to pay the "small bill." Deam asked for and received board authorization to pay out a dividend that would have totalled $4,700.

A question arose later concerning the amount of the dividend. The board's protocol was to express a dividend as a percentage of the stock's par value ($100), which was the stock's original selling price. During the June 10, 1986, meeting, however, the dividend was not expressed as a percentage of the stock's par value but instead was recorded by Board Secretary Steve Capitanio in the board minutes as "$.4434 cents per share." Jeanette Warren, the person who typed the minutes of the board meeting, inquired of Steve Capitanio and of Karen Kay Langley concerning this discrepancy. They told her that the dividend was "44 cents per share." Tr. at 654. A dividend of 44 cents per share would have resulted in a total dividend payment of approximately $4,700. Tr. at 262. Deam, however, caused American Bank to pay a dividend totalling $470,000, which is 100 times greater than the dividend amount originally authorized by the board. The majority of the $470,000 dividend went to American Banshares, Inc., which owned 99% of American Bank. Both Deam and Capitanio owned shares in American Banshares. American Banshares subsequently used the dividend money to buy back some of its stock owned by Deam and Capitanio, thereby passing the dividend money through to the two officers, who in turn used it to pay on loans they had with American Bank.

During a routine nongovernmental audit of American Bank conducted later in 1986, it was discovered that American Bank's $470,-000 total dividend payment was 100 times greater than the dividend amount authorized by the board on June 10, 1986. Tr. at 1015. The auditor, John Schulte, brought this discrepancy to Deam's attention. Tr. at 1015. Deam then convened another board meeting in December 1986 and informed the members that there were some "technical" or "minor" corrections that had to be made to the minutes from the June 10, 1986, board meeting. Tr. at 693. The board minutes were "corrected" to clarify that the "Board approved a dividend of 44.34% to all stockholders of record. . . ." First Dakota's app., Tab 20, at 7. At no time do the minutes reveal a discussion of $470,000 in dividends being declared.

St. Paul contends that because the board clarified the minutes and actually authorized a total dividend payment of $470,000, the fidelity bonds do not apply. Specifically, St. Paul argues that the fidelity bonds only insure against fraudulent or dishonest acts of an "employee," and that a bank's board of directors, which authorized particular conduct, cannot be an "employee" under the fidelity bond.

■ A condition precedent to legal ratification or authorization of a transaction by a board of directors is the full disclosure of all material facts. *See General Fin. Corp. v. The Fidelity & Casualty Co. of New York,* 439 F.2d 981 (8th Cir.1971). During this scheme, Deam continually kept the board "in the dark" and failed to provide full disclosure of all material facts. After requesting a dividend to pay a "small" bill of American Banshares, Inc., Deam purposefully expressed the dividend in terms of cents per share as opposed to the traditional percentage of the stock's par value. Instead of paying a small dividend totalling $4,700, Deam caused American Bank to pay out a total dividend

equalling $470,000. Once confronted by an auditor with this apparent discrepancy and the substantial amount of dividend payment, Deam convened another board meeting and misleadingly told the members that they needed to simply make a "minor" or "technical" correction to the minutes from the June 1986 meeting. Additionally, FDIC chief examiner Radach testified that the $470,000 total dividend payment resulted in negative retained earnings by American Bank, *see* tr. at 259, and that American Bank suffered a $470,000 loss from the unauthorized dividend. *See* Tr. at 272. Finally, Radach also testified that this $470,000 dividend violated South Dakota state banking laws. Tr. at 269.

We conclude that there was sufficient evidence to support the jury's finding that Deam engaged in fraudulent or dishonest conduct that resulted in a loss to American Bank. "Void, fraudulent or illegal acts cannot be ratified," *see General Fin. Corp.*, 439 F.2d at 986 (citing *Emerson v. Labor Inv. Corp.*, 284 F.2d 946 (10th Cir.1960)), and therefore, the loss is covered under the fidelity bonds. Consequently, we reverse the district court's grant of judgment as a matter of law in favor of St. Paul on the Unauthorized Dividend claim, and we reinstate the $470,000 jury verdict in favor of First Dakota. We direct the district court to consider on remand whether or not First Dakota is entitled to prejudgment interest on the award.

### 2. The Northern Extrusions Claim

Officials in Yankton, South Dakota, successfully enticed Northern Extrusions to locate in Yankton. American Bank originally authorized and extended an $850,000 "bridge loan," or line of credit, to Northern Extrusions. The bridge loan was to be repaid by the sale of Yankton industrial revenue bonds. After Yankton officials were unable to sell the revenue bonds, American Bank agreed to accept the revenue bonds in place of the bridge loan. Unbeknownst to the board, Deam purchased stock in Northern Extrusions. American Bank subsequently loaned an additional $100,000 to Northern Extrusions. Several months later, Deam sold his Northern Extrusions stock to Mr. Light, Northern Extrusions's attorney, for the same

price that Deam originally bought the stock. First Dakota does not dispute this fact. Northern Extrusions has defaulted in the payment of the revenue bonds and the $100,000 operating loan, but the bonds have not been called nor Northern Extrusions' mortgage foreclosed.

As previously stated, in order for a loss caused by a dishonest or fraudulent act to be covered under the fidelity bond, an employee must have acted with manifest intent (1) to cause American Bank a loss and (2) to obtain at least a $2,500 financial benefit. *See* St. Paul's app. at 21 (bond).

■ First Dakota argues that the district court erred in granting St. Paul's motion for judgment as a matter of law on the Northern Extrusions claim for two reasons. First, First Dakota reargues that the additional requirements included in the fidelity bond, i.e., the manifest intent requirement and the $2,500 financial benefit requirement, are contrary to South Dakota state law and therefore are null and void. As discussed above, we reject this argument. Second, First Dakota contends that Deam did receive at least a $2,500 financial benefit because the Northern Extrusions stock that Deam purchased actually appreciated in value from $13,500 to $21,750 as reflected in the values Deam placed on the stock in a financial statement Deam furnished to the bank. St. Paul disagrees and argues that Deam did not receive a $2,500 financial benefit because Deam sold the Northern Extrusions stock at the same price that he originally purchased the stock.

We conclude that no reasonable juror could have found that Deam received any financial benefit let alone a financial benefit of at least $2,500. Deam bought the stock for $13,500 and sold the stock for $13,500. Although Deam may have thought the value of the stock increased in the interim period while Deam owned it, we conclude that unrealized gain does not constitute a financial benefit for the purposes of the bond. Because Deam sold the stock for the same price that he bought it, he did not receive a financial benefit from his holding of Northern Extrusions stock. Accordingly, we affirm the district court's grant of judgment as a matter of law in favor of St. Paul on the

$1,050,000 award on the Northern Extrusions claim.

### D. The Eight Remaining Claims

The jury found in favor of First Dakota on the remaining eight claims and awarded the following damages amounts as indicated in the parenthesis: Bancomp Services, Inc. ($387,812), American Enterprises, Inc. ($394,000), Clearfield Development ($237,878), North American Storage ($375,000), Leasing Companies ($482,460), Oyate, Inc. ($599,000), Cessna Airplane Purchase ($937,500), and Midwest Publishing, Inc. ($190,070). St. Paul contends that First Dakota failed to prove that Deam and Langley acted with "manifest intent" as required under the fidelity bond, and therefore, the district court erred in failing to grant judgment as a matter of law on all of these remaining eight claims.

■ We conclude that with respect to seven of the eight claims, the one exception being the Midwest Publishing, Inc. claim, there was sufficient evidence to submit these claims to the jury. Intent is a quintessential jury issue. Although we may have reached a different result on some of the individual claims if we were the fact finders, our task is to review the evidence to determine whether the evidence was sufficient to defeat a Rule 50 motion for judgment as a matter of law. *See* Fed.R.Civ.P. 50. In our opinion, the evidence was sufficient. Therefore, we affirm the district court's refusal to grant St. Paul's motion for judgment as a matter of law with respect to the Bancomp Services, Inc. claim, the American Enterprises, Inc. claim, the Clearfield Development claim, the North American Storage claim, the Leasing Companies claim, the Oyate, Inc. claim, and the Cessna Airplane Purchase claim.

■ With respect to the Midwest Publishing, Inc. claim, however, we conclude that no reasonable juror could have found that a loss resulted from this claim. First, the claim did not result in a loss to American Bank. American Bank was the trustee for the Deam children's irrevocable trust. The trust owned 80.77% of Midwest Publishing's stock. Midwest Publishing's only asset was a building independently appraised at $569,-

000 but encumbered by a mortgage totalling $330,677. Therefore, the net value to the Deam children's trust of the Midwest Publishing stock was approximately $184,000, which is roughly 80% of $238,323, the difference between the fair market value of the building and its outstanding mortgage. In 1985, the trust sold all of its stock in Midwest Publishing to one of American Bank's subsidiaries for a total of $190,000, roughly the equivalent of the trust's 80.77% interest in the remaining value of the building. Second, this claim did not involve fraudulent or dishonest conduct by an employee. Deam was not a party to this transaction, and he also abstained from voting on the final approval of the purchase. This transaction was a legal and legitimate transaction by American Bank. Because no fraudulent or dishonest act by an employee was committed and American bank did not lose any money, there is no coverage under the fidelity bond. Consequently, we reverse the district court's refusal to grant judgment as a matter of law to St. Paul with respect to the Midwest Publishing, Inc. claim, and we set aside the $190,070 verdict that the jury found in favor of First Dakota.

### E. Attorney's Fees

First Dakota argues that the district court clearly erred in applying South Dakota law by denying its motion for attorney's fees. We disagree.

■ Under South Dakota law, "attorney's fees may be awarded if the insurance company has refused to pay the full amount of the loss, and that such refusal is vexatious or without reasonable cause." *Tri–State Ins. Co. of Minn. v. Bollinger,* 476 N.W.2d 697, 702 (S.D.1991) (citing S.D.Codified Laws Ann. § 58–12–3 (1991)). The question of whether the insurance company acted vexatiously or unreasonably is a question of fact and reviewed under the clearly erroneous standard. *Id.* (citations omitted).

■ In this case, St. Paul did not act vexatiously or unreasonably in refusing coverage under the fidelity bond. An insurance company is not guilty of vexatious or unreasonable conduct by asserting and relying on

its legitimate coverage defenses. *Id.* (citing *American Family Mut. Ins. v. Merrill,* 454 N.W.2d 555 (S.D.1990)). St. Paul raised legitimate defenses based on the provisions of the fidelity bond. The issues were challenging, the evidence was enormous, and the jury eventually found for both First Dakota and for St. Paul on the various claims. We conclude that the district court did not clearly err in finding that St. Paul's refusal to pay was reasonable and not vexatious and, therefore, in denying First Dakota's motion for attorney's fees.

### F. Prejudgment Interest

St. Paul argues that the district court erred in awarding $1,039,621 in prejudgment interest on five of the specific claims and in its calculation of prejudgment interest. We agree that prejudgment interest should be awarded on the five claims but disagree with the starting date that the district court used to calculate the award of prejudgment interest.

The district court granted First Dakota's motion for prejudgment interest on five claims: the Oyate, Inc. claim; the Cessna Airplane Purchase claim; the American Enterprises, Inc. claim; the Clearfield Development claim; and the North American Storage claim. *See First Dakota Nat'l Bank f/d/b/a American State Bank, a national bank v. St. Paul Fire & Marine Ins. Co.,* No. CIV 89–4047 (D.S.D. filed Aug. 9, 1991) (amended order on motions). The district court, however, denied First Dakota's motion for prejudgment interest on three claims: the Bancomp Services, Inc. claim, the Midwest Publishing, Inc. claim, and the Leasing Companies claim. *Id.*

Under South Dakota law, " '[t]he prevailing party is entitled to prejudgment interest only if damages are certain or capable of being made certain by calculation; prejudgment interest is not to be awarded if the damages are uncertain until determined by the trier of fact.' " *Honomichl v. Modlin,* 477 N.W.2d 599, 600 (S.D.1991) (citations omitted); *see* S.D. Codified Laws Ann. § 21–1–11 (1987); *see also Simpson v. Norwesco,*

*Inc.,* 583 F.2d 1007, 1013–14 (8th Cir.1978) (applying South Dakota law). The fact that a defendant disputes the value of the damages claimed by a plaintiff or that the jury returned a verdict that varies from the damages alleged by a plaintiff in the complaint, however, does not preclude the award of prejudgment interest. *Clements v. Gabriel,* 472 N.W.2d 480, 484 (S.D.1991) (citation omitted).

In this case, St. Paul did not dispute the value of the individual claims but instead argued that the claims are not covered under the fidelity bonds. Furthermore, even if First Dakota's claims of losses varied before the trial, an award of prejudgment interest is still permissible. *See id.* at 484 (citing *Amert v. Ziebarth Constr. Co.,* 400 N.W.2d 888 (S.D. 1987)). In our view, St. Paul had reasonably available information to compute the amount of First Dakota's damages. Accordingly, we conclude that the district court correctly awarded prejudgment interest on the Oyate, Inc. claim; the Cessna Airplane Purchase claim; the American Enterprises, Inc. claim; the Clearfield Development claim; and the North American Storage claim.[5]

The district court ordered the prejudgment interest to begin accruing on December 29, 1987, which is the date that First Dakota filed its first proof of loss with St. Paul as required under the terms of the fidelity bond. St. Paul argues that the district court erred in setting the date upon which the award of prejudgment interest began to accrue. We agree.

Under South Dakota law, where the amount of plaintiff's damages is certain and the defendant refuses to pay the entire amount, prejudgment interest starts to accrue from the date of defendant's refusal. *North River Ins. Co. v. Golden Rule Constr.,* 296 N.W.2d 910, 914 (S.D.1980). In this case, First Dakota's damages were certain and St. Paul refused to pay the entire amount. Therefore, the correct date that prejudgment interest should begin to accrue on each specific claim is the date that St.

---

**5.** First Dakota does not appeal the denial of prejudgment interest on the Bancomp Services, Inc. claim, the Midwest Publishing, Inc. claim, and the Leasing Companies claim.

Paul denied coverage on the Oyate, Inc. claim; the Cessna Airplane Purchase claim; the American Enterprises, Inc. claim; the Clearfield Development claim; and the North American Storage claim. St. Paul contends that it denied coverage of the five claims on different dates. Because this is a factual question that remains unresolved, we reverse and remand with instructions to the district court to recalculate the award of prejudgment interest by first determining and then using the specific date that St. Paul denied coverage on each of the five claims.

### G. Jury Instructions Given by the District Court

#### 1. Manifest Intent Instruction

■ St. Paul contends that the district court erred in its instruction regarding manifest intent. Specifically, it contends that the district court eviscerated the manifest intent requirement by instructing the jury that an employee who causes the bank to incur a loss is deemed to intend the natural consequences of his actions. In effect, St. Paul argues that the manifest intent instruction impermissibly created a mandatory presumption that relieved First Dakota of its burden of proving this necessary element under the fidelity bond. We disagree.

■ In reviewing jury instructions, we must determine whether the instruction fairly and adequately states the applicable law when reading the instructions as a whole. *Financial Holding Corp. v. Garnac Grain Co., Inc.*, 965 F.2d 591, 595 (8th Cir.1992) (citation omitted). As always, the district court has broad discretion in determining both the form and the specific language of the instruction. *Id.*

The manifest intent instruction given to the jury was:

"Manifest intent," as used in these instructions, means a clearly evident intent.

Intent ordinarily may not be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer a person's intent from surrounding circumstances. You may consider any statement made or act done or omitted by a party whose intent is in issue, and all of the facts and circumstances which indicate his state of mind.

You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is for you to decide what facts have been established by the evidence.

The intent with which an act is done is shown by the circumstances surrounding the act, the manner in which it is done, and the means used.

A person is deemed to intend the natural consequences of his actions.

St. Paul's app. at 229 (jury instruction no. 14).

■ In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court held that a jury instruction that either creates a mandatory presumption or shifts the burden of persuasion on a necessary element of a crime violates a defendant's due process rights. In *Sandstrom*, the Supreme Court invalidated a jury instruction that read "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 515, 99 S.Ct. at 2454; *see also Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). "A mandatory presumption instructs the jury that it must infer the presumed fact if [one party] proves certain predicate facts." *Francis*, 471 U.S. at 314, 105 S.Ct. at 1970. A permissive inference however permits but does not require the jury to draw a particular conclusion. *Id.* We must review the jury instructions as a whole to determine whether a mandatory presumption was impermissibly created. *Id.* at 309, 105 S.Ct. at 1968.

St. Paul specifically points to the last sentence of the instruction that says, "A person is deemed to intend the natural consequences of his actions," and argues that this language creates an impermissible mandatory presumption under *Sandstrom*. Because "deemed" can mean "held," this "deemed to intend" language, if given without any qualification, shares the flaw of the impermissible "law presumes" language in *Sandstrom*. In this case, however, the manifest intent in-

struction included qualifying language. Any potential adverse effect of the "deemed" language was cured by the nonmandatory qualifying language in the remainder of the instruction. The instruction, when read as a whole, indicates that the jury had a choice whether or not to draw an inference on intent from Deam and Langley's acts. Most of the instruction is couched in language which instructed the jury that it "may infer" or that it "may consider." This language is acceptable under *Sandstrom* because it permits, but does not require, the jury to come to a particular conclusion. It cannot fairly be concluded that the jury seized on the "deemed" language and felt that it was obligated or required to infer that Deam and/or Langley acted with manifest intent. Furthermore, after reviewing the instructions as a whole, we find that the court specifically instructed the jury that First Dakota had the burden of proving by a preponderance of the evidence that Deam and/or Langley acted with manifest intent. *See* St. Paul's app. at 226 (jury instruction no. 12). We conclude that the manifest intent instruction as a whole did not create a mandatory presumption that relieved First Dakota of its burden of persuasion to prove that Deam and/or Langley acted with manifest intent, which is a necessary element to be proved under the fidelity bond. Consequently, St. Paul's due process rights were not violated.[6]

### 2. Dishonest or Fraudulent Acts Instruction

St. Paul also argues that the district court erred in its instruction regarding "dishonest or fraudulent" acts. Specifically, it contends that the instruction unfairly broadened the meaning of the terms "dishonest" and "fraudulent." We disagree.

The dishonest or fraudulent acts instruction read:

The words "dishonest" and "fraudulent" used with reference to conduct governed by a fidelity bond are to be given a broad meaning.

Misrepresentation of facts and deliberate deception by pretense and stealth constitute dishonest and fraudulent conduct within the terms of a fidelity bond.

If an employee looks after his own benefit, creates a conflict of interest, or acts in disregard of his employer's interest, subjecting the employer to a likelihood of loss, he is acting fraudulently and dishonestly within the meaning of a banker's fidelity bond.

St. Paul's app. at 228 (jury instruction no. 13).

We conclude that the instruction fairly and adequately states the law. *See Financial Holding Corp.*, 965 F.2d at 595. Although the Supreme Court of South Dakota has not interpreted the terms "dishonest" and "fraudulent," we have construed a nearly identical fidelity bond and held that these terms are to be interpreted broadly. *See First Am. State Bank v. Continental Ins. Co.*, 897 F.2d 319, 325 (8th Cir.1990) (applying Iowa law to a post–1976 fidelity bond). Consequently, we affirm the district court's instruction regarding "dishonest or fraudulent" acts.

### 3. Discovery Instruction

St. Paul next contends that the district court clearly erred in instructing the jury on the issue of discovery. Specifically, it contends that the definition of discovery was improperly limited to the knowledge possessed only by directors. We disagree.

The discovery instruction read:

"Discovery" occurred when any director of the American State Bank, other than William Deam, Karen Langley, or Steve Capitanio, became aware of facts which would have caused a reasonable person to assume that a loss covered by the Bond had been or would be incurred even though the exact amount or details of the loss may not then have been known.

St. Paul's app. at 230 (jury instruction no. 16). The district court stated that there was

---

**6.** In the future, we suggest that intent instructions when necessary to be given should not include any "deemed to intend" language or any "law presumes" language, but instead should be couched in nonmandatory terms that clearly provide a jury with a choice of whether or not to make an inference. *See United States v. Martin*, 772 F.2d 1442, 1445 (8th Cir.1985).

not sufficient evidence to conclude that any noncolluding officer became aware of facts that a loss covered under the bond had been incurred. Tr. at 1967–68. We conclude that the district court did not clearly err in limiting discovery to only that of "any director." St. Paul failed to introduce sufficient evidence that any noncolluding officer discovered that a loss covered under the bond had occurred. A party that fails to introduce sufficient evidence to support a jury instruction is not entitled to it. *See Farmland Indus. v. Morrison–Quirk Grain*, 987 F.2d 1335, 1341 (8th Cir.1993). Consequently, the district court's discovery instruction fairly and adequately instructed the jury.

### H. Jury Instructions Not Given by the District Court

#### 1. Statute of Limitations Instruction

█ St. Paul contends that the district court clearly erred in refusing to instruct the jury on the statute of limitations issue. We disagree. Both parties agree that American Bank first notified St. Paul of a loss covered under the bond on September 10, 1987. The jury specifically found that American Bank notified St. Paul "as soon as practicable" and also that this notification was within 30 days after discovering the loss. Therefore, the jury implicitly found that American Bank first discovered a loss on or after August 10, 1987. Under the two-year statute of limitations provision of the bond, First Dakota would have had until August 10, 1989, in which to file a lawsuit against St. Paul. First Dakota filed its lawsuit against St. Paul on March 22, 1989, well within the two-year time period. The issues of whether the fidelity bonds are insurance contracts or surety contracts and whether a two-year or six-year statute should apply, therefore, are moot. Consequently, the district court did not clearly err in refusing to give a statute of limitations instruction. *See United States v. Gruenberg*, 989 F.2d 971, 975 (8th Cir.1993) (a district court's decision not to give a particular jury instruction is reviewed under the clearly erroneous standard).

#### 2. Absence of Coverage for Board Members Instruction

█ St. Paul also argues that the district court clearly erred by refusing to instruct the jury that the acts of American Bank's board of directors are not covered under the fidelity bonds. We disagree. First, St. Paul is not entitled to have the jury instructed on each and every specific provision included in the fidelity bond. Second, the fidelity bond was offered and admitted into evidence and St. Paul made numerous arguments concerning the fact that acts of board members are not covered under the bond. Finally, in the Elements Instruction, the district court told the jury that First Dakota had the burden of proving that either Deam, Langley, and/or Capitanio acted dishonestly or fraudulently as defined in the fidelity bond. *See* St. Paul's app. at 226–27 (jury instruction no. 12). Therefore, the jury was specifically limited to considering only the acts of those three employees, and not the acts of the board of directors. We conclude that the district court did not clearly err by refusing to instruct the jury that the acts of the board of directors were not covered under the bond.

#### 3. Termination Instruction

█ St. Paul contends that the district court clearly erred by refusing to instruct the jury on its theory of the case. One theory of St. Paul's case was that coverage under the bond for Deam and/or Langley had terminated as of January 17, 1986. St. Paul argues (1) that a noncolluding director or officer of American Bank learned of dishonest or fraudulent acts committed by Deam and/or Langley as of January 17, 1986, (2) that coverage for acts committed by Deam and/or Langley under the bond therefore terminated, (3) that Deam and/or Langley subsequently committed additional dishonest or fraudulent acts, and (4) that because coverage had previously terminated, St. Paul is not liable for the losses sustained by American Bank for Deam's subsequent acts. Under St. Paul's theory, the bond did not cover the losses resulting from the following claims that transpired after January 17, 1986: namely, the Unauthorized Dividend claim, the Northern Extrusions claim; the Oyate, Inc. claim; and the Cessna airplane purchase claim.

Although both parties introduced evidence and argued this termination issue, the district court refused to instruct the jury on termination of coverage because it concluded that there was no evidence upon which the jury could reasonably find that (1) a noncolluding officer or director learned of any dishonest or fraudulent act committed by Deam and/or Langley *and* (2) Deam and/or Langley subsequently committed an additional dishonest or fraudulent act. Tr. at 1967–68. We agree.

First, as we previously discussed, there was not sufficient evidence to conclude that any noncolluding director or officer learned of a loss covered under the bond from the State Report as of January 17, 1986, nor from the unauthorized dividend payment in June 1986. Second, no noncolluding director or officer could have learned of a loss covered under the bond resulting from the Northern Extrusions claim because, as we have concluded, any loss on that claim was not covered under the bond. Third, there was not sufficient evidence to conclude that a noncolluding director or officer learned of a loss resulting from the Oyate certificate of deposit transaction in August 1987. The evidence shows that Deam without authority cashed the $599,000 certificate, applied the money to the Oyate previous loan balance, and then, in an effort to conceal his conduct, sent cashiers checks to Magnuson, the owner of the certificate, to represent the interest payments. The evidence does not support St. Paul's contention that employee Liebrich learned of a loss covered under the bond. Finally, the Cessna airplane purchase claim discovered in December 1987 represented the last loss resulting from Deam's scheme. Because there were no subsequent acts committed by Deam and/or Langley after the Cessna airplane purchase, the question whether any noncolluding director or officer learned of a loss from this act is moot. After thorough review, we are not left with a " 'substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.' " *See Farmland Indus. v. Morrison–Quirk Grain,* 987 F.2d 1335, 1343 (8th Cir.1993). Consequently, we conclude that the district court did not clearly err in refusing to instruct the jury on the issue of

termination because St. Paul failed to introduce sufficient evidence to support the instruction. *Id.* at 1341 (a party is entitled to an instruction reflecting the party's theory of the case if the instruction is legally correct and there is evidence to support it) (citation omitted).

## I. Remaining Issues

We have thoroughly reviewed the remaining issues, including the claim that the trial court committed reversible error in admitting expert testimony by the witness Radach. Although like the experienced district judge we believe the issue was close, we do not believe the court abused its discretion. We find no merit in the remaining issues.

## III. Conclusion

We conclude that First Dakota filed its complaint within the bond's two-year statute of limitations period. We affirm the grant of judgment as a matter of law with regard to the Northern Extrusions claim. We reverse the grant of judgment as a matter of law with regard to the Unauthorized Dividend claim and, therefore, reinstate the jury's verdict on this claim in favor of First Dakota. We affirm the district court's denial of judgment as a matter of law with regard to the following claims: Bancomp Services, Inc.; American Enterprises, Inc.; Clearfield Development; North American Storage; Leasing Companies; Oyate, Inc.; Cessna Airplane Purchase. We reverse the district court's denial of judgment as a matter of law with regard to the Midwest Publishing, Inc. claim and, therefore, set aside the jury's verdict on this claim. We affirm the denial of attorney's fees. We remand for recalculation of prejudgment interest.