# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 00-2118

_____

| | |
|---|---|
| BancInsure, Inc., | * |
| | * |
| Plaintiff/Appellee, | * |
| | * |
| v. | * |
| | * |
| BNC National Bank, N.A., | * |
| | * |
| Defendant/Appellant, | * |
| | * |
| Debra J. Gronlie, | * |
| | * |
| Defendant. | * |

_____

No. 00-3524

_____

Appeals from the United States
District Court for the
District of North Dakota.

| | |
|---|---|
| BancInsure, Inc., | * |
| | * |
| Plaintiff/Appellant, | * |
| | * |
| v. | * |
| | * |
| BNC National Bank, N.A., | * |
| | * |
| Defendant/Appellee, | * |
| | * |
| Debra J. Gronlie, | * |
| | * |
| Defendant. | * |

_____

Submitted: June 14, 2001

Filed: August 16, 2001
_____

Before WOLLMAN, Chief Judge, MAGILL, and HAMILTON,[1] Circuit Judges.
_____

WOLLMAN, Chief Judge.

BNC National Bank, N.A., (BNC or the bank) sought to recoup its losses from various loan and credit transactions handled by Debra J. Gronlie, a former employee, under the terms of a financial institution bond issued by BancInsure, Inc. BancInsure remitted $886,319.34 to BNC and then brought suit in federal district court[2] for a declaration of its obligation under the bond and for judgment based on its subrogation rights. BNC appeals from the district court's determination that BancInsure owed only part of the $886,319.34 and that BNC must refund the balance, and from a subsequent determination that BancInsure is entitled to subrogation of one-fourth of the proceeds from a settlement. BancInsure appeals from the court's decision denying it prejudgment interest on the refund. We affirm.

## I.

We draw the facts largely from the district court's opinion. BancInsure is a captive company for state bankers associations and provides insurance coverage for

_____

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the Fourth Circuit, sitting by designation.

[2]The Honorable Patrick A. Conmy, United States District Judge for the District of North Dakota.

various banks.  BancInsure issued BNC a financial institution bond that provided fidelity coverage for certain acts of employees, stating in relevant part:

> The Underwriter . . . agrees to indemnify the Insured for:
> ### INSURING AGREEMENTS
> ### FIDELITY
> Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
>
> Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
>
> (a) to cause the Insured to sustain such loss; and
>
> (b) to obtain financial benefit for the Employee or another person or entity.
>
> However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.

Appellant's Supp. App. at 63.

Gronlie was employed by BNC as a loan officer from May of 1991 until April of 1997.  She was promoted to the level of senior vice president and was awarded a lending authority of $200,000, which meant that she could approve up to that amount in a loan without seeking prior approval from a loan committee.

In the spring of 1995, Gronlie began to provide loans to James Thomas Harper (Tom Harper), his company, Top Dog Productions (Top Dog), and various other entities connected with Harper (collectively, Harper).  Tom Harper and Top Dog

distributed and managed motion simulators.[3]  Because BNC had little familiarity with that industry, in May of 1995 a loan committee member instructed Gronlie to increase her "due diligence" before going ahead with two loan transactions, but otherwise approved them.  Subsequent transactions were also approved by the loan committee, including a $750,000 line of credit.  From 1995 until her termination, Gronlie approved numerous loans and lines of credit for Harper and Harper's customers.  Whether inadvertently or intentionally, Top Dog submitted false documents, including a false tax return, in support of the various loans.

In the summer of 1996, Gronlie's husband and Tom Harper created a company called Alamation, owned 50% by each, for the purchase of a motion simulator. Financing was arranged through a bank other than BNC, and Gronlie personally guaranteed the loan.  After her termination, Gronlie and her husband bought out Tom Harper's interest in Alamation.

Various of the Harper loans and lines of credit were insufficiently secured and have not been repaid.  After receiving proofs of loss from BNC on these transactions in 1997, BancInsure paid BNC several installments totaling $886,319.34.  A September 18, 1998, letter sent by BancInsure with a payment of $124,179.19 states that "BancInsure tenders the sum . . . subject to a complete and full reservation of rights which shall be deemed continuing and mutual between BancInsure and BNC . . . . BancInsure shall not require execution of release or satisfaction by BNC at this time in recognition of the reservation of rights between the parties."

On September 21, 1998, BancInsure filed this declaratory judgment action against BNC and Gronlie, seeking a determination of its obligation under the bond.

---

[3]A motion simulator is a large enclosed capsule with seats and a video screen in the capsule's interior.  The capsule is individually mounted on a hydraulic or mechanical system that moves it in coordination with a video playing on the inside.

BNC counterclaimed against BancInsure and cross-claimed against Gronlie, who, in turn, asserted cross-claims against BNC. The district court severed the cross-claims and proceeded to trial on the bond issue. On March 22, 2000, the court issued its judgment that BancInsure owed BNC $300,000 on a separate policy provision, a finding not disputed on appeal. The court then ruled that only two of the remaining transactions listed in BNC's proofs of loss were covered under the bond and ordered that $404,810.15 be returned to BancInsure. The court also held that BancInsure was not precluded from collecting the refund by failing to specifically reserve its right to a refund in the letters it sent to BNC with payment. In June of 2000, the court denied BancInsure's request for prejudgment interest on the refund under the bond.

While the court was considering the claims under the bond, the United States Department of the Treasury Office of the Comptroller of the Currency (Comptroller) commenced administrative proceedings against Gronlie seeking various debarments from the banking industry and ultimately brokered a settlement with her and others. The settlement, signed by Gronlie on May 31, 2000, purports to resolve all claims between the Comptroller, Gronlie, her husband, Alamation, BNC, and BancInsure. Under the terms of the settlement, Gronlie and her husband, individually and on behalf of Alamation, agreed to pay $473,400 in installments, secured by Alamation's assets and a $100,000 personal guaranty from Gronlie, "to BNC and/or BancInsure" as restitution for the losses BNC suffered. BNC and BancInsure signed the settlement agreement in July of 2000.

In August of 2000, BancInsure moved the district court for a decision on its subrogation claim, asserting that it was entitled to step into the shoes of BNC under the terms of the bond and the doctrine of legal subrogation to the extent of its payment and that it should receive some of the funds remitted by Gronlie in settlement. After further briefing and a hearing, the court issued an amended judgment on September 13, 2000, holding that BancInsure was entitled to subrogation rights and some of the settlement money. BNC appeals from that decision.

## II.

In this diversity action, we review the court's determination of state insurance law de novo, Bell v. Allstate Life Ins. Co., 160 F.3d 452, 455 (8th Cir. 1998), and its factual findings for clear error, Chicago Title Ins. Co. v. FDIC, 172 F.3d 601, 604 (8th Cir. 1999).

### A.  Coverage Under the Bond Language

For BNC to obtain coverage under the fidelity portion of the financial institution bond for its loss, Gronlie must have had the "the manifest intent:  (a) to cause the Insured to sustain such loss; and (b) to obtain financial benefit for the Employee or another person or entity."  For loan transactions, Gronlie must also have received a financial benefit of $2500.  The district court found that BNC had proved that only two of the transactions in question, ones in which "funds were sent to [Tom] Harper in direct violation of the advice given to the bank regarding the use of the money," reflected the manifest intent required as a condition of coverage under the bond.  In making this finding, the district court relied on the definition of "manifest intent" used by this court in First Dakota National Bank v. St. Paul Fire & Marine Insurance Company, 2 F.3d 801 (8th Cir. 1993).

BNC argues that the district court clearly erred in not finding that all of its losses, which total approximately two million dollars, resulted from Gronlie's fraudulent or dishonest acts.  It urges us to elaborate on our discussion of manifest intent in First Dakota National Bank.  Reminding us that BNC had successfully prevailed upon the district court to adopt the definition in First Dakota National Bank that it now argues against, BancInsure contends that we should affirm the court's factual determinations.

North Dakota courts have not ruled on the definition of "manifest intent."  North Dakota contract law requires courts to "principally look to the plain, ordinary meaning

-6-

of the undefined term to guide . . . interpretation." Hanneman v. Continental Western Ins. Co., 575 N.W.2d 445, 450-51 (N.D. 1998) (internal citations omitted). "The dictionary is a good source to determine the plain, ordinary definition." Id. at 451. In the dictionary, "manifest" is defined as "readily perceived by the senses . . . [and/or] easily understood or recognized by the mind: obvious." Merriam-Webster's Collegiate Dictionary 707 (10th ed. 1993). We believe that the dictionary definition aptly comports with our discussion of manifest intent in First Dakota National Bank.

In First Dakota National Bank, 2 F.3d at 813, we upheld a jury instruction that stated that manifest intent under South Dakota law means a "clearly evident intent." The instruction stated: "You may consider any statement made or act done or omitted by a party whose intent is in issue, and all of the facts and circumstances which indicate his state of mind." Id. "You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted." Id.; see FDIC v. United Pacific Ins. Co., 20 F.3d 1070, 1077-78 (10th Cir. 1994) (approving similar jury instructions); FDIC v. Oldenburg, 34 F.3d 1529, 1539 (10th Cir. 1994) (holding that manifest intent "exists when a particular result is substantially certain to follow from the employee's conduct"); but see Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland, 205 F.3d 615, 637-42 (3d Cir. 2000). Because BNC will not now be heard to complain of the definition that it urged the district court to apply, and because North Dakota's contract law comports with the interpretation of manifest intent adopted in First Dakota National Bank, we hold that the district court did not err in utilizing the definition of manifest intent set forth in First Dakota National Bank.

We turn next to BNC's argument that the district court's factual findings are clearly erroneous. The court determined that Gronlie and her husband both had a financial interest in Alamation, thus "[a]ll transactions from [the time of its creation] carry the taint of conflict of interest." Although the court found many "bad banking practices" by Gronlie and others at BNC, it found that only two loan transactions, one

in September and one in November of 1996, reflected a manifest intent on Gronlie's part to cause harm to BNC.

In these two transactions, Gronlie had involved herself in such a way as to secure her own (Alamation's) rights to a simulator at the expense of the bank's security. The district court observed that Gronlie's loan history comments pertaining to these transactions recited that all of the funds from the loans would stay with the bank and be applied against Top Dog's outstanding line of credit, but that, under Gronlie's direction, this is not what had happened. The court found that in one of the transactions $131,508.85 left the bank and was wired to Top Dog, and that $50,000 left the bank and went to Top Dog in the second transaction, "resulting in the line of credit remaining at least $181,508.85 greater than that contemplated when the officer's comments were circulated." The court found that these funds were sent to Top Dog so that Alamation could obtain a simulator. The court concluded that these transactions, in which money "earlier earmarked to reduce the loan balances left the bank in a time frame where the funds were needed by Top Dog to obtain delivery of the machine owned jointly by Alamation and Harper[,] do meet the policy criteria."

As the Tenth Circuit has stated, "where an individual's conduct falls somewhere between the two extremes of embezzlement and simple poor judgment, intent becomes a question of fact." Oldenburg, 34 F.3d at 1540 (quotation marks omitted). In this case, the determination of whether the requisite manifest intent was present required a resolution of disputed facts and findings of credibility. "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Northgate Homes, Inc. v. City of Dayton, 126 F.3d 1095, 1101 (8th Cir. 1997) (citation omitted); see also Stanton v. Larry Fowler Trucking, Inc., 52 F.3d 723, 729 (8th Cir. 1995). We conclude that the court's findings are not clearly erroneous, and we thus affirm the district court's determination that BancInsure must pay only $181,508.85 under the fidelity coverage portion of the bond.

## B. Reservation of Rights

BNC argues that BancInsure did not reserve its right to seek a refund of the money it paid to BNC. The district court found this to be "a naive attempt at a 'gotcha'" and noted that the cases cited by BNC were inapposite.

In its letter accompanying the September 1998 funds transfer, BancInsure set out a "full and complete" mutual reservation of rights. In its answer to BancInsure's complaint in the declaratory judgment action, BNC admitted that it had received the funds pursuant to a full reservation of rights. We agree with the district court that BNC's argument that BancInsure should be precluded from seeking a refund is without merit. Cf. Northwest Airlines, Inc. v. Federal Ins. Co., 32 F.3d 349, 356 (8th Cir. 1994) (noting that although reservation of rights language could have been more specific, parties knew what the arguments and claims of each for coverage would be). Additionally, district courts have broad power under 28 U.S.C. § 2202 to craft damages awards in declaratory judgment actions to effectuate their judgment. See Insurance Services of Beaufort, Inc. v. Aetna Cas. and Surety Co., 966 F.2d 847, 852 (4th Cir. 1992). We find no error in the district court's determination.

## C. Subrogation

On September 13, 2000, after briefing and a hearing on the matter, the district court ruled on BancInsure's request for an amended judgment resolving its subrogation claim. During the hearing, the parties sought the court's guidance on whether BancInsure was entitled to any settlement proceeds. The court noted that the final documents to effectuate the settlement brokered by the Comptroller had not been executed because "BNC and BancInsure cannot agree on what amount, if any, BancInsure is entitled to receive as it share of the payments (if any?) eventually received under the settlement agreement." BNC contends that BancInsure is entitled to none of the settlement proceeds, even though the settlement binds BancInsure.

BancInsure, in turn, argues that it is entitled to subrogation for its payment under the bond and thus should be allowed to collect from the settlement, which includes restitution for the loss for which it paid BNC.

In an effort to resolve the dispute, the court concluded that BancInsure was entitled to subrogation on the $181,508.85 it was obligated to pay under the bond, but reduced that amount to $118,350.00 as an equitable offset for the costs BNC expended in related court and administrative proceedings that BNC used to pressure Gronlie and Alamation to settle. The court then ruled that as payments of the settlement agreement are received, they shall "be apportioned one fourth to Bancinsure and three fourths to BNC." The court dismissed the remaining cross-claims with prejudice in view of the settlement agreement.

Because we have affirmed the district court's determination of the amount owed to BNC under the fidelity portion of the bond, BancInsure may properly invoke subrogation for that amount. See Universal Title Ins. Co. v. United States, 942 F.2d 1311, 1315 (8th Cir. 1991) ("[T]he right to subrogation is predicated on the full payment of the debt or claim of another by one who is not a mere volunteer or intermeddler."); cf. State Farm Mut. Auto. Ins. Co. v. Wee, 196 N.W.2d 54, 59-60 (N.D. 1971) ("Equitable subrogation . . . is based on the theory that the one invoking it has rightfully discharged debt at the instance and for the benefit of the debtor.").

Under traditional rules, a party seeking subrogation "would stand in the 'shoes'" of another. United States v. Lohman, 21 F.3d 844, 846 (8th Cir. 1994). "While subrogation is generally defined as the substitution of one person in the place of another with reference to a lawful claim or right, . . . there are actually two distinct types[:] . . . conventional subrogation and legal subrogation, which is often confusingly called equitable subrogation, due to its origin and basis in equity." Universal Title, 942 F.2d at 1315 (citation and quotation marks omitted). Conventional subrogation is generally contractual, occurring where "one having no interest or any relation to the matter pays

-10-

the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid." Id. Legal subrogation, in contrast, "has for its purpose the working out of an equitable adjustment and the doing of complete and perfect justice between the parties by securing the ultimate discharge of a debt by the person who in equity and good conscience ought to pay it." Id.

The district court, which had presided over a bench trial, listened to the arguments of the parties and the testimony of their witnesses, and parsed out the voluminous record, made a determination based on the various equities of the situation and ruled that BancInsure was entitled to a reduced subrogation right. We discern no error in this use of legal subrogation principles to work an "equitable adjustment," id., between the parties. Because BancInsure's subrogation right to collect from Gronlie was limited by the settlement, the court's subrogation judgment was designed to ensure that BancInsure, through its right to receive one-fourth of the payments made under the settlement, will recover the $118,350.00 it is entitled to under its right of subrogation. We find no error in the district court's ruling on this point.

## D. Prejudgment Interest

On June 13, 2000, the district court denied BancInsure prejudgment interest on the amount of money to be refunded to it because the "sum or sums involved were hardly capable of certain determination." BancInsure argues that it is entitled to prejudgment interest because the amount at issue was an amount certain.

Under North Dakota law, "[e]very person who is entitled to recover damages certain or capable of being made certain by calculation, the right to recover which is vested in the person upon a particular day, also is entitled to recover interest thereon from that day . . . ." N.D. Cent. Code § 32-03-04 (1996). "Difficulty in computation does not defeat one's right to interest, if it is susceptible of being made certain by mathematical calculation from known factors" but an "ambiguity in the contract terms

-11-

[that] makes the claim uncertain as to both time and quantity" will defeat a claim for prejudgment interest.  Super Hooper, Inc. v. Dietrich & Sons, Inc., 347 N.W.2d 152, 156 (N.D. 1984).

In Koch Hydrocarbon Company v. MDU Resources Group, Inc., 988 F.2d 1529, 1547-48 (8th Cir. 1993), we considered this North Dakota statutory provision in the context of a complicated gas-pricing and deregulation case, concluding that the damages in the case were not "certain" as that term is used in the statute because of the ambiguities in the contracts and the legal and factual complexities attendant to determining an appropriate award of damages.  The North Dakota statute was adopted from California's statutes.  In Fireman's Fund Insurance Company v. Allstate Insurance Company, 286 Cal. Rptr. 146, 158 (Cal. Ct. App. 1991) (citation omitted), the court stated that prejudgment interest is not authorized where the amount of damage "depends on a judicial determination based upon conflicting evidence."  Id. (citation omitted).

The district court in this case was faced with a dispute over how much of the loss was covered and what computation methods should be used to determine the amount of that loss.  The court was required to resolve the factual and legal complexities of the intertwined loans and interconnected parties to reach a determination of those issues.  Accordingly, we conclude that the court did not err in determining that the amount of damages was not a "sum certain" and thus that BancInsure was not entitled to prejudgment interest.

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.